# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663

---

| | |
|---|---|
| Appellate Court Caption | TEODORO RAMIREZ, Plaintiff-Appellee, v. FCL BUILDERS, INC., an Illinois Corporation, Defendant-Appellant. |
| | |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-3663 |
| | |
| Rehearing denied | January 28, 2014 |
| Modified opinion filed | January 31, 2014 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The award of $1.588 million in damages to a roofer for the back injury he suffered while working for a roofing subcontractor on a large warehouse project was upheld where the trial court did not err in denying defendant general contractor's motion for a judgment notwithstanding the verdict, notwithstanding the general contractor's contentions that it had no liability for plaintiff's injuries and that the trial court gave improper instructions, made evidentiary errors, and failed to impose sanctions for plaintiff's discovery errors, since there was evidence of defendant's vicarious and direct liability in connection with the performance of the work of moving materials in a safe manner, and none of the alleged trial errors deprived defendant of a fair trial to the extent that the verdict was affected. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-6482; the Hon. Susan Zwick, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Elizabeth A. Knight and Sarah Hansen Sotos, both of Knight, Hoppe, Kurnik & Knight, Ltd., of Rosemont, and John P. Prusik and Louis S. Glaza, both of Prusik Selby Daley & Kezelis, P.C., of Chicago, for appellant. |
| | Robert J. Napleton and John C. Coyne, both of Motherway & Napleton, of Chicago, and Law Offices of Lynn D. Dowd, of Wheaton (Lynn D. Dowd, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. |
| | Justices McBride and Palmer concurred in the judgment and opinion. |

## OPINION

¶ 1        Plaintiff Teodoro Ramirez was injured while employed as a roofer for Sullivan Roofing, a nonparty to this litigation. At the time of plaintiff's injury, Sullivan Roofing was operating as a subcontractor for defendant FCL Builders, Inc., the general contractor for a warehouse project. Plaintiff filed suit against defendant, alleging that defendant was negligent and, after a jury trial, the jury found defendant liable, awarding plaintiff damages in the amount of $1.588 million. Defendant appeals, arguing that (1) the trial court erred in not granting judgment notwithstanding the verdict in favor of defendant, where defendant had no liability for plaintiff's injuries as a matter of law; and, alternatively, (2) the trial court should have granted defendant a new trial where the trial court improperly instructed the jury, made errors in the admission of evidence, and failed to sanction plaintiff for several discovery violations. For the reasons that follow, we affirm.

¶ 2                                BACKGROUND
¶ 3                                I. Complaint
¶ 4        On June 13, 2008, plaintiff filed a complaint against defendant; the complaint was amended twice and it was the second amended complaint on which the parties went to trial.[1]

_____

        [1]Plaintiff also filed suit against the property owner, but that claim was settled prior to trial and is not part of the instant appeal.

The second amended complaint alleges that, on or before September 29, 2004, defendant was a general contractor responsible for the design, construction, and maintenance of a warehouse facility in Romeoville, Illinois. Plaintiff was working on the roof of the warehouse on September 29, 2004, when plaintiff and his coworkers from Sullivan Roofing were manually pushing a "large, bulky and heavy roll of roofing membrane material" on the roof of the warehouse, causing plaintiff's injuries. Although plaintiff was working on the roof of the warehouse as an employee of Sullivan Roofing, defendant "was present during the course of the construction project, supervised and coordinated the work being done, designated various work methods, maintained and checked work progress, and participated in scheduling the work and the inspection thereof." Additionally, defendant "had the authority to stop the work, refuse the work, tools and materials, and to order changes in the work in the event that the work was being performed in a dangerous manner or for any other reason."

¶ 5    The second amended complaint alleges that, at the time of the injury, defendant, through its agent, knew or should have known of the manner in which plaintiff's work was being performed and defendant had a duty to exercise reasonable care under the circumstances to protect the safety of plaintiff. Notwithstanding that duty, defendant was negligent in one or more of the following ways:

"a. Failed to permit Honda [all-terrain vehicles (ATVs)] to be used by the roofing crew to move heavy roofing materials; or

b. Allowed an improper work practice to occur as it relates to material handling in violation of OSHA Standard 2236; or

c. Failed to place plywood planking at various locations on the metal deck thereby allowing Honda ATV's to be used to move heavy roofing materials; or

d. Failed to instruct the Sullivan Roofing crew in the recognition and avoidance of an unsafe condition as it relates to material handling in violation of CFR 1926.21(b)(2); or

e. Failed to follow the safe customs and practices of the construction industry in the manner in which the workers, such as the plaintiff, were required to perform their duties; or

f. Failed to ensure handling of heavy roofing materials were done in a reasonably careful manner."

The second amended complaint alleges that, as a result of one or more of defendant's acts or omissions, plaintiff suffered injuries "of a personal and pecuniary nature."

¶ 6    As an affirmative defense, defendant alleges that plaintiff had the duty to exercise reasonable care and caution for his own safety and failed to do so in one or more of the following ways:

"a. Failed to properly move and/or push roofing materials;

b. Failed to make a reasonable inspection of the premises to ensure that he was familiar with the premises;

c. Failed to use appropriate methods in the moving and/or pushing of roofing materials;

d. Performed his work in a manner in which the Plaintiff knew, or in the exercise of ordinary care, should have known was harmful or dangerous;

e. Was otherwise careless and negligent."

¶ 7                                                    II. Discovery

¶ 8      Since defendant raises several arguments concerning discovery, we relate the relevant facts.

¶ 9      On August 12, 2010, plaintiff filed answers to defendant's Rule 213 interrogatories, disclosing his anticipated witnesses, including five Rule 213(f)(2) independent expert witnesses and no Rule 213(f)(3) controlled expert witnesses. Ill. S. Ct. R. 213 (eff. Jan. 1, 2007). On January 11, 2011, the trial court ordered plaintiff to answer defendant's Rule 213(f)(3) interrogatories by April 1, 2011. On March 13, 2011, the court entered an order that discovery was to close on May 4, 2011. On April 5, 2011, the trial court ordered plaintiff to disclose any Rule 213(f)(3) witnesses by April 4, 2011, with the witnesses to be deposed by May 5, 2011; the court again ordered discovery closed on May 4, 2011.

¶ 10     On April 20, 2011, plaintiff filed supplemental Rule 213 disclosures, including an additional Rule 213(f)(1) lay witness and one Rule 213(f)(3) controlled expert witness, Dennis Puchalski, a construction safety consultant.

¶ 11     On September 16, 2011, plaintiff's current attorneys filed an appearance as additional attorneys of record and, in October 2011, plaintiff's current attorneys replaced the former attorneys as plaintiff's counsel.

¶ 12     On February 21, 2012, the attorneys for the parties certified that all fact, medical, and opinion discovery was complete; that all deposition of Rule 213(f)(1), (2), and (3) witnesses had been taken or waived in writing or in a court order; that all necessary evidence depositions had been taken; and that no dispositive motions were pending or would be filed by any party prior to trial. On March 8, 2012, the case was set for trial on May 3, 2012.

¶ 13     On April 24, 2012, plaintiff filed a notice of videotaped evidence deposition for Jaime Rojas, which would take place via telephone on April 26, 2012, since Rojas was located in Colorado. On April 26, 2012, defendant filed an emergency motion to quash the videotaped telephone evidence deposition. In the motion, defendant argued that two days' notice for a videotaped evidence deposition was insufficient and would not allow defense counsel the opportunity to attend the deposition in person and to cross-examine the deponent in person. Further, defendant claimed that the deponent, Jamie Rojas, had not been listed by plaintiff as a Rule 213(f)(1), (2), or (3) witness. On the same day, the trial court denied defendant's motion to quash the deposition and further ordered the May 3, 2012, trial date to stand.

¶ 14     On May 8, 2012, during trial, defendant filed a motion *in limine* seeking to bar plaintiff from calling David Gibson as a trial witness. The motion claimed that, on October 28, 2011, plaintiff made an oral motion seeking to disclose an additional Rule 213(f)(3) damages witness, which the trial court granted over defendant's objection. Plaintiff's disclosure of Gibson as an additional witness "resulted in defense counsel being compelled to retain its own defense expert on the issue of damages," causing prejudice. On the same day, the trial court denied defendant's motion.

-4-

¶ 15    Defendant also filed a motion *in limine* seeking to bar plaintiff from calling Jaime Rojas as a witness for three reasons: "insufficient notice of an evidence deposition, violation of the Supreme Court 213(f)(2), and subsequently after taking the deposition learning of additional documentation that was relevant to the functional capacity evaluation that Mr. Rojas was testifying about on that given day." Defendant argued that, despite plaintiff's claim that a letter was sent in January 2012 disclosing Rojas as a witness, defense counsel never received such a letter. The trial court denied defendant's motion.

¶ 16                                    III. Trial

¶ 17    Trial began on May 7, 2012. Evidence was presented concerning the installation of the roof in the case at bar, as well as plaintiff's medical history following the injury. Several witnesses also testified about the safety of the procedures used on the roof, as well as plaintiff's damages.

¶ 18                              A. Roofing Witnesses

¶ 19                              1. Michael Sullivan

¶ 20    Michael Sullivan, who was employed by Sullivan Roofing and was the brother of the company's owner, was Sullivan Roofing's safety director in September 2004. Sullivan testified that Sullivan Roofing was in the business of installing commercial roofs, including "ballasted roofing which has rock on top to hold [it] down"; Sullivan estimated that 30 to 40 roofers would have been employed by Sullivan Roofing in 2004, and it was typical for Sullivan Roofing to have multiple jobs at the same time. In 2004, defendant, the general contractor, hired Sullivan Roofing as a subcontractor on a project called the "Wilton Industries Project" in Romeoville (the Wilton project). The Wilton project was to be a big-box warehouse with a ballasted roof "somewhere in the vicinity" of 450,000 square feet, which was "a large roof, but it wasn't a huge roof." The roof on the Wilton project was pitched, or slightly inclined.

¶ 21    Sullivan testified that, prior to beginning work on the Wilton project, Sullivan Roofing received a "welcome subcontractor type letter" from defendant, in which defendant indicated that it was "committed" to Sullivan Roofing's safety and wanted to provide a workplace "reasonably free of recognized safety hazards," which Sullivan testified was "very common" on a project of the scope of the Wilton project. The letter further stated that "safety and safety awareness is a two-way street," which Sullivan agreed with, testifying that "[e]verybody on site is responsible for safety," including the general contractor, subcontractor, and employees. Sullivan also testified that, on the Wilton project, defendant had certain "intolerable offenses," which meant that "generally the subcontractor has to behave in a certain fashion or they're gone."

¶ 22    Sullivan also explained the process of laying a ballasted roof such as that installed on the Wilton project. First, panels of insulation were placed on top of metal decking; the panels were four feet by eight feet and weighed approximately four pounds. The panels were wrapped in bundles of 23 and hoisted to the roof by a "boom truck," essentially, a big truck with a crane. The materials and tools, including insulation, rolls of rubber membrane, and

ATVs, were placed along the perimeter of the roof, at least six feet from the edge; it was Sullivan Roofing's decision where to place the materials and Sullivan testified that it would not be unusual to have delivery of roofing materials staggered over several weeks. The insulation was placed, beginning at one corner of the building, enough to cover an area of 50 feet by 200 feet. A sheet of rubber membrane was then placed on top of the insulation; the entire deck was not laid with insulation before beginning to place the rubber membrane because, otherwise, it would be blown away by wind. After the rubber membrane was placed, stones would be spread on top of it; initially, rows of stone would be placed to keep the insulation and rubber in place in case of wind, which would be filled in later with more stones. The bundles of insulation could be pushed by two workers over short distances.

¶ 23    Sullivan testified that "once in awhile [*sic*]" ATVs would assist in rolling out the rolls of rubber membrane: "It wasn't always. When the Hondas[2] were available or they came around, sometimes they would help push the rolls over, yes." Sullivan testified that the ATVs would also be used after the rubber membrane was placed, to spread the gravel on top of the rubber membrane. He could not recall the size of the rubber membrane rolls but, on a roof the size of the Wilton project, "a lot of times we use 50 by 200s." The rolls, when wrapped, were approximately 2.5 feet high and 10 feet wide and would weigh between 1,500 to 2,000 pounds depending on the size. When moving rolls of that size and weight at distances of over 30 feet, "[i]t all depends on how many guys were available. Sometimes we had eight guys pushing the roll. Sometimes there would be less guys, and the Honda would come in between everybody and help push it." Sullivan testified that it would be "very rare" for workers to physically push the rubber membrane more than 300 feet because "[t]hose [rolls] are positioned so that we don't have to move them that far when we load the job."

¶ 24    Sullivan testified that, when roofing materials were hoisted onto the roof of the Wilton project, the materials were "dimpling" or denting the deck, and a solution needed to be provided by "the powers that be." Sullivan could not recall who informed him of the issue, "but I was called, and it was said we have an issue"; Sullivan later testified that "I believe John [Zelasco[3]] called me" and informed him of the problem with the decking. Sullivan testified that ATVs were used on the Wilton project and were only temporarily stopped: "That was a decision made at the point in time all this happened, to stop everything, and we had to figure out a way that we could use them again and get things rolling and be able to load so we wouldn't damage the deck." A meeting was held to discuss the solution to the problem, at which Sullivan and Dave Majestic, also a Sullivan Roofing employee, were present, but Sullivan could not recall whether John Zelasco was present on behalf of defendant: "I don't recall if John was there. John wouldn't have been in that discussion until we figured out what we wanted to do and then we would pose that to him."

¶ 25    Sullivan testified that Zelasco had the authority to stop work on the project if he observed unsafe practices and further testified that "FCL is very strict on safety. So that's more you

---

[2]Throughout the trial, witnesses used the terms "ATVs" and "Hondas" interchangeably.

[3]Zelasco was defendant's superintendent on the Wilton project.

know, anything that happens, John has the right. He runs the job. He has the right to stop." If Zelasco observed someone performing his job in an unsafe manner, Zelasco would have the right to stop that work and then would contact Sullivan. Zelasco would also coordinate the work and monitor the work of the subcontractors. However, Sullivan testified that defendant was not involved in the means and methods of Sullivan Roofing's work on the Wilton project.

¶ 26 At the meeting, they "came up with a plywood runway solution," which would use a plywood runway system to distribute the weight of the heavy roofing materials and permit the ATVs to be used. Sullivan testified that "[w]e made the decision to use the plywood runway and posed that to John to help to protect the roof. That was our decision." Sullivan further testified that "after a conference between John and the powers that be at Sullivan, that was a solution that was implemented," and it worked to stop the dimpling.

¶ 27 Sullivan also testified to his work as safety director. Sullivan testified that, in his position as safety director, he would visit the work site once every one to three days, for approximately an hour; Sullivan was not on the roof on September 29, 2004. Sullivan testified that Sullivan Roofing had a safety manual given to each of its employees and that safe material handling was "the number one safety issue that roofers have" because "[t]here's a lot of ergonomics to it again. There's a lot of bending. There's a lot of lifting involved. There's a lot of pushing rolls, if you will. And everybody I harp constantly on lifting properly, don't pull, you know, how to properly lift. Constantly we go over that."

¶ 28 Sullivan testified that he conducted "toolbox talks" once a week, which were "a topic for the day basically. Sometimes it's on safe lifting. Sometimes it's on wind safety. Sometimes it's on heat. We have all different kinds of topics that we use. And what I do is I go on the roofs, I go through these topics. I gather everybody together. I read them, so everybody can't just sign. They have to know that  you know, what we're doing for the day. And they sign off on that they've read this and they understand what I've given them for the day." Sullivan testified that the toolbox talks were conducted by Sullivan Roofing for its employees to keep its employees working safely. Sullivan conducted a toolbox talk on September 29, 2004, which plaintiff and his brother Sabeno both attended, as demonstrated by their signatures. That toolbox talk was "a safety review. It was over fall protection, material handling, MSDS sheets, electrical safety, and fire safety."

¶ 29 Sullivan testified that, as safety director, he did not believe it was unsafe to have a Sullivan Roofing crew move a roll manually. Sullivan further testified that, with enough workers, using ATVs was not safer than manually pushing the rolls of membrane: "If you had a number of guys on there, it really wasn't  we've done that for a number of years  I don't know  safer, I wouldn't say it's safer. It helped us move it along quicker. *** If you have four guys and the Honda helps, absolutely. If you have eight guys on there, it moves pretty easily." He acknowledged that, during his deposition, he responded that using ATVs "would help, yes." On recross, Sullivan clarified his testimony concerning the use of ATVs: "When we were all talking about moving these rolls and speaking about moving them 20, 30 feet, that's when the rolls are in position. We use the Hondas to put the rolls in position. From the position point, when they're spread out on the roof because  he is correct in saying that we  sometimes we move the roll 2, 300 feet because of the width of the building. We have

-7-

to put them in position. The Hondas are used for that. When we have to move them in position to lay it over the insulation is when I'm talking about pushing it 20, 30 feet. It's not to get it off a load and then roll these things by hand 300, 400 feet. That does not  that's not what we do." Sullivan further testified that it was "fair to say" that it was "never appropriate" to move a roll of rubber membrane from one side of the building to the other without the use of an ATV.

¶ 30    Sullivan testified that plaintiff was an employee of Sullivan Roofing and was a "great worker" who, at one point, they were considering making a foreman. Sullivan characterized plaintiff as reliable, dependable, honest, and very good at his job. Plaintiff was familiar with rubber roofs and ballasted roofs, including installing thermal plastic membranes. Plaintiff was part of Frank Pesek's crew and worked closely with Pesek. Sullivan recalled plaintiff informing him that he was planning to visit a doctor for his back, but denied discouraging the doctor visit or threatening to fire plaintiff.

¶ 31    On cross-examination, defense counsel attempted to introduce an incident report completed by Sullivan into evidence.[4] Sullivan testified that plaintiff reported his back injury to Sullivan, who filled out an incident report in his capacity as safety director; Sullivan testified that keeping such reports was part of Sullivan Roofing's normal course of business. Sullivan further testified that the report was in his handwriting and bore his signature. Defense counsel then sought to admit the report into evidence, and plaintiff's counsel objected. The trial court examined the document outside the presence of the jury, noting that it showed an incident date of October 6 and the date of reporting as October 11. Further, the report indicated that the injury was due to pushing bundles of insulation, not rolling rubber membrane; defense counsel explained that "[t]hat's exactly why I want this before the jury. Mr. Ramirez told him exactly the opposite of what he's claiming in this lawsuit." The trial court summed up the defense's theory concerning the incident report: "It appears to me that what counsel is saying is that any injury that occurred didn't occur on September 29. It occurred on October 6. It didn't occur when he was pushing a roll, it occurred when he was pushing a bundle of insulation. *** You're saying based on what Mr. Ramirez told Mr. Sullivan, September 29 didn't happen."

¶ 32    The trial court brought Sullivan back into the courtroom for further questioning concerning the incident report. Sullivan testified that he had an independent memory of speaking with plaintiff about the incident that was the subject of the report, and that he recalled being on the roof with plaintiff and Frank Pesek, the foreman, when plaintiff informed him of the incident. He further testified that plaintiff reported the incident to him on October 11 but told him that it had occurred on October 6. Sullivan admitted that the payroll records went to October 10 but that the last date plaintiff was on the payroll, according to the records, was October 7. Sullivan further admitted that it was possible that he was standing on a different roof, and not the Wilton roof, when plaintiff informed him of the incident and that "my dates could be wrong on the document. And I don't know. I can't verify that. But I remember specifically standing there talking to him." After Sullivan's

---

[4]The incident report is not included in the record on appeal.

examination, the court sustained the objection: "The objection as to the record itself is sustained. Whatever you choose to have him testify to as to his memory is still of evidentiary value. But because of the lack of reliability on the dates based on the voir dire and the *** deposition, I'm going to sustain the objection. I don't *** find it to be within the business records exception because of lack of reliability. The rest of the testimony is up to you." The court further noted: "It has to be created in an ordinary course of business and if it's on or about the time. That's why they're reliable. And what we have is that missing element. It wasn't created on or about the time because he says the date may be wrong and I don't remember."

¶ 33    The jury was then brought back into the courtroom, and cross-examination of Sullivan continued. Sullivan testified that, at one point during the two weeks of the Wilton project, plaintiff approached him on the roof of the Wilton project and informed him of the accident; Pesek was also present during the conversation. Plaintiff informed them that he was pushing a bundle of insulation alone "and felt a twinge in his back." Sullivan testified that pushing insulation alone was contrary to Sullivan Roofing's recommendations for material handling, which required two people to push a bundle of insulation. Sullivan denied telling plaintiff not to visit a doctor.

¶ 34    Sullivan testified that, based on the time sheets, plaintiff was working on a different project on Monday, September 27. He was working on the Wilton project on September 28 and 29, and was working on a third project on September 30 and did not work on Friday, October 1.

¶ 35                              2. David Majestic

¶ 36    David Majestic, vice president of field operations for Sullivan Roofing, testified that, at some point during the Wilton project, he learned that there was a problem with damage to the decking. Defendant's superintendent, John Zelasco, placed a call to Sullivan Roofing informing it of damage to the decking. Majestic later testified that he "received a call at some point in time" indicating that there were issues, but "[w]ho gave me that phone call, I don't recall that." The problem required the work to stop until a solution was developed.

¶ 37    Majestic testified that the decision to use plywood to solve the problem was a collaboration between Sullivan Roofing and defendant. Majestic further testified that he was present while the plywood was in use, although he admitted that in his deposition, he testified that he was not present.

¶ 38    Majestic testified that general contractors left it to Sullivan Roofing to determine the means and methods of its work. On the Wilton project specifically, defendant never told him or his crew how to perform their work on the roof or not to use ATVs on the roof, although defendant had the right to stop the work if they were damaging the roof.

¶ 39    Majestic testified that ATVs were "workhorse[s]" used regularly in the roofing industry, including moving insulation and pushing rolls of rubber membrane, which weighed 2,500 to 2,800 pounds. At times, ATVs were occupied with other work on the roof and were not available to workers needing to move rolls of membrane. It was preferable to have several people move a roll of membrane, and protocol required a worker who had issues with the

size of the roll to either inform the foreman of his concern or find additional workers to push the roll. Majestic did observe men manually pushing membrane weighing 2,500 to 2,800 pounds up to 200 feet in the past.

¶ 40    Majestic testified that plaintiff was a very good worker who was responsible and dependable and that the company had considered him for the position of foreman.

¶ 41                                3. Frank Pesek

¶ 42    Frank Pesek, the roofing foreman for Sullivan Roofing on the Wilton project, testified that plaintiff worked under him and that he was a very good worker hard working, dependable, and honest. At one time, plaintiff was Pesek's "leadman," or right-hand man. Pesek testified that plaintiff informed him that he was injured on the Wilton project. When someone reported an injury, Pesek reported it to Sullivan.

¶ 43    Pesek testified that, on a job the size of the Wilton project, ATVs would be used to push rolls of rubber membrane to various points on the roof; the ATVs had been used "since day one when I was here." Typically, two ATVs would be used to push a roll of rubber membrane, one on the left and one on the right of the roll. Sullivan Roofing "always used the ATVs" to move rolls of membrane significant distances "because it's easier" on the workers' bodies, but "[i]f we had to" manually push them, "we would."

¶ 44    Pesek testified that the type of rubber membrane used on the Wilton project would be unrolled "kind of like a paper towel" and then unfolded "like a blanket." When unfolded, the roll would be approximately 200 by 50 feet. The materials for the roofing work were brought onto the roof by Sullivan Roofing's crane. From time to time, if soil conditions prevented a crane from being placed at a particular location, the general contractor would direct the crane to be placed in a better location with more favorable soil conditions.

¶ 45    Pesek testified that he was notified by "[s]omeone from [defendant] FCL" that there was damage to the roof decking and he "took a timeout to craft a solution to this deck damage issue." Pesek could not recall whether someone gave an order not to use ATVs, but "if we stopped using the Hondas, it's because someone told me not to use them." Pesek agreed that "it was more likely than not that there was an order to not use the Hondas to push the rolls," and testified that "the order to not use the Hondas either came from Dave Majestic or the [defendant's] superintendent on this job." Pesek further testified that Majestic would not call Pesek "out of the blue" and order him to stop using the ATVs. Pesek testified that defendant had the power to halt the work that Sullivan Roofing was performing. Pesek further testified that he took his orders from Dave Majestic, his supervisor.

¶ 46    Pesek testified that once the ATVs were not allowed to push the rolls, the rolls of membrane would have to be manually pushed by the crew. Pesek "would rather use Hondas," but did not view anything unsafe in manually rolling the rubber membrane, providing there were enough workers doing so, and ordered his crew to manually move the rolls; Pesek testified that, if he observed an unsafe act being performed by a member of his crew, he had the authority to stop it. There was a potential for injury when manually pushing a roll of rubber membrane 300 feet because "they are heavy. They're heavy. You are pushing rolls that weigh a lot. Anything in roofing is strenuous."

-10-

¶ 47 Pesek testified that there was a plywood runway system in place to permit the ATVs to transport bundles of insulation, but that they were not in place to permit the ATVs to move the rolls of rubber membrane.

¶ 48                                          4. John Zelasco

¶ 49 John Zelasco, defendant's project superintendent on the Wilton project, testified that he was the highest-ranking employee of defendant present on the site on a daily basis. Zelasco testified that it was "more likely than not" that defendant and the property owner agreed that defendant would work in a safe manner. On the first day that roofing materials were loaded onto the roof, he noticed that roofing activity was creasing the decking and notified Pesek, the foreman for Sullivan Roofing, as well as Michael Sullivan. He also informed his two immediate superiors: his project manager and his senior project manager.

¶ 50 Zelasco testified that defendant was the only general contractor on the Wilton project, and that he was defendant's only superintendent on the project. Zelasco, as a superintendent, "had the power to stop work on this job generally." After the decking was damaged, Zelasco notified Pesek and Sullivan "and at that point I think it may have been their call to stop the activity to take a look at what was going on, maybe to assess what activities were taking place." However, Zelasco also testified that it was a joint decision between defendant and Sullivan Roofing to cease working for a day to assess the damage.

¶ 51 Zelasco testified that it was very common for roofers to use ATVs on a roof and that it would be highly unusual not to use ATVs on a roof the size of the Wilton project. He denied ordering Sullivan Roofing employees not to use ATVs to move rolls of rubber membrane or for any other purpose; he testified that "[t]hey had the right to perform their activities," including using the ATVs to move the rolls of rubber membrane. He testified that, prior to beginning the roofing work, he met with Majestic to discuss good access points for the cranes; Zelasco estimated that Sullivan Roofing had access to 90% of the building's perimeter, and then decided, without Zelasco's involvement, where along that perimeter it wanted to unload its materials. Zelasco testified that Sullivan Roofing had unrestricted use of ATVs to move its materials and that "I never gave any restrictions on the means and methods of the contractor to do his job."

¶ 52 Zelasco also testified about defendant's list of "intolerable offenses" by subcontractors, which were "certain job rules that are strictly enforced." One such rule concerned violations of the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.* (2006)). Zelasco testified that violation of the rules could result in immediate and permanent removal of the subcontractor from the project. Zelasco testified that "[e]veryone has to work as a team" to ensure a safe work site and that "we're committed to everyone's safety on the job site."

¶ 53 Zelasco held safety "in the highest priority," and he was authorized to be an outreach trainer for the Occupational Safety and Health Administration (OSHA) and was involved with several other safety organizations. One of his duties for defendant on a given project was to ensure that the work site was safe. He considered Sullivan Roofing to be "one of the best" companies because "[t]hey have very high standards of safety. They *** have the right equipment. It's very, very rare that there's ever an issue."

¶ 54     Zelasco observed membrane used on a number of roofs and that, "[t]ypically, it's moved from the truck with a crane up onto the roof. And then very typically the roofers themselves, usually five or more guys, will get behind it and push it into position, getting it either rolled up onto a cart or onto some means of transporting it where it needs to go. But it's always it's usually done manually when they're stocking the job." Once they were rolled onto the cart or ATV, the rolls would be transported to their final destination on the roof.

¶ 55     If Zelasco observed any workers behaving in a way that was causing a problem, he would speak to the foreman or the superintendent in order to address the issue. He denied ever telling roofers to stop using ATVs on the Wilton project and did not know of anyone from defendant doing so. He admitted that he and Majestic, from Sullivan Roofing, would have the authority to tell Pesek to stop using the ATVs if they were damaging the deck.

¶ 56     Zelasco was not informed of plaintiff's injury until defendant was sued in the instant lawsuit.

¶ 57     After Zelasco's testimony, outside the presence of the jury, the trial court found that Zelasco had not provided a sufficient foundation to admit the contract between defendant and the property owner into evidence. Plaintiff's counsel indicated that they had relied on defendant's disclosure that Zelasco would lay a foundation for the contract, so they were "kind of in a bind here," since he was unable to do so. Plaintiff's counsel requested that, "if the Court feels the foundation, as it relates to the contract specifically, is inadequate, then I given the [Rule] 213 disclosure of defense, relative to Mr. Zelasco, I think I'm entitled to call a record keeper, a signatory or somebody from FCL that can lay the foundation, notwithstanding the fact it's the day before I rest my case." Over defendant's objection, the court agreed and told defendant, "you're on notice that I would grant plaintiff's motion. And that the request will come to you, I'm assuming, within the next 12 hours. And that before this case is put to rest, I expect to see some discussion and/or resolution one way or another." The next day, plaintiff called Christopher Linn, vice president of defendant, who provided the necessary foundation and the contract was admitted into evidence.

¶ 58                                   5. Sabino Ramirez

¶ 59     Sabino Ramirez, plaintiff's brother, who also worked as a roofer for Sullivan Roofing on the Wilton project, testified that, on September 29, 2004, both he and plaintiff were working at the Wilton project; Sabino as a "signal guy" for the crane and plaintiff "[p]ush[ing] the rolls and other material." Typically, when rolls of rubber membrane needed to be moved, they would be moved by ATVs. However, the crew was ordered not to use ATVs to push the rolls by someone wearing a white hard hat,[5] so plaintiff was moving them manually. Approximately two hours later, plaintiff informed Sabino that he had a great deal of back pain.

¶ 60     Sabino testified that he took all of his direction on the job from Pesek, the foreman, or

_____

[5]Pesek, the foreman for Sullivan Roofing, testified that defendant's employees wore white hard hats.

from other Sullivan Roofing employees, such as Majestic or Sullivan. Sabino had no communication with defendant on the job.

¶ 61                                    6. Plaintiff

¶ 62      Plaintiff testified that he was born in Mexico and moved to the United States in 1986; he began working as a roofer in 1989 and was a roofer until his injury in 2004. On September 29, 2004, he was working as a roofer and was not permitted to use ATVs to push the rolls of rubber membrane "[b]ecause some guy told us don't use the Hondas"; plaintiff testified that the man who told the workers not to use the ATVs was John Zelasco, but plaintiff never spoke to him directly. Pesek then ordered them to roll the membrane manually. The ATVs were only used to move bundles of insulation. Plaintiff testified that it was unusual to manually move the rolls 300 feet and that "[a]ll the time we use the Hondas."

¶ 63      Plaintiff testified that the roof was wet and slightly inclined. He testified that "I, myself, and seven more guys, I was in the middle, we started to push the roll from the edge of the roof to 300 feet far, far away." Plaintiff continued: "I hurt my back when we was pushing the roll into the ridge. And the metal is very wet and slippery. So, the roll goes back and everybody is trying to hold it, but that's impossible to hold that kind of roll. So, everybody, they start to hold it and they  I was in the middle. So, I tried to hold it, the roll, and that's when I feel my back like crack when you crack your fingers and I feel very, very painful." Plaintiff testified that they were moving the roll up a slight incline, and it began rolling back four to five feet, until someone was able to stop it by placing insulation under it.

¶ 64      Plaintiff testified that after he noticed the pain in his back, he informed Pesek, the foreman; he did not inform Sullivan, who was not on the roof that day. Pesek instructed plaintiff to "take it easy," so plaintiff did light work for several hours, then took pain pills and rested for a few hours. After returning home, plaintiff was walking slowly and had a great deal of pain in his low back.

¶ 65      Plaintiff went to work the next day, a Thursday, but again only did light work. He did not work Friday, Saturday, or Sunday, but rested at home. On Tuesday, his wife made an appointment with Dr. Desmond Martello, a chiropractor she found through the yellow pages. That week, plaintiff avoided heavy lifting at work and was permitted light duty. On October 8, 2004, he visited Dr. Martello, and visited him often during the next three months for physical therapy; however, his back did not improve. Plaintiff also had injections ordered by Dr. Sean Salehi, and Dr. Salehi performed surgery in 2005; the surgery helped for the first several months, but the pain returned.

¶ 66      Plaintiff testified that Dr. Alberto,[6] a pain doctor, again injected plaintiff and prescribed pain medicine and, at some point, plaintiff visited Jaime Rojas for a functional capacity evaluation. Eventually, plaintiff visited Dr. Edward Goldberg, who performed a second surgery. Again, the surgery seemed to help at first, but the pain returned.

¶ 67      Plaintiff testified that he is unable to participate in activities that he had enjoyed, such as

---

[6]Dr. Alberto's first name is not in the record on appeal.

-13-

boxing and soccer. Plaintiff further testified that he attempted to obtain work with his wife's employer, but was not hired.

¶ 68    Plaintiff testified that there was no plywood runway system in place to permit the ATVs to be used at the time of the accident.

¶ 69                                    B. Medical and Lifestyle Witnesses

¶ 70                                             1. Juana Ramirez

¶ 71    Juana Ramirez, plaintiff's wife, testified that plaintiff had been a roofer since he came to the United States from Mexico in 1986 and loved his job. Until his accident in 2004, plaintiff played soccer and basketball and enjoyed running and boxing. Juana testified that on September 24, 2004, plaintiff was working for Sullivan Roofing with his brother Sabino. When plaintiff came home from work, Juana observed him holding his back with his left hand and having trouble walking. Plaintiff informed Juana that he had injured his back at work, so Juana prepared a hot bath for him. She also gave him painkillers and placed a cold pack on his back, but none of it helped his back pain. Plaintiff went to work the next day, but Juana called the doctor, Dr. Martello, the following week. That Friday, Juana accompanied plaintiff to visit Dr. Martello, who took X-rays and performed hot and cold therapy and electrical stimulation. Plaintiff visited Dr. Martello for approximately three months, but his back had not improved and he was in continuous pain.

¶ 72    In 2005, plaintiff and Juana visited Dr. Salehi, a surgeon, who gave plaintiff cortisone injections and, when those did not work, performed surgery on plaintiff's back in August 2005. Plaintiff attended physical therapy and visited Dr. Elborno,[7] a "pain management doctor" referred by Dr. Salehi. Plaintiff then began treatment with Dr. Edward Goldberg, "an orthopedic," and had a second surgery on his low back in October 2007; plaintiff has not returned to his roofing job or worked at all.

¶ 73    Juana testified that, as of the trial date in May 2012, plaintiff had not returned to work as a roofer. He had attempted to find other work, such as in the maintenance department of Juana's employer, but was rejected because of his back problems. Juana characterized plaintiff as "totally different" than prior to his accident, since he was unable to work or participate in the activities he enjoyed, such as sports, or do work around the house, such as mowing the lawn or shoveling snow.

¶ 74                                          2. Dr. Desmond Martello

¶ 75    Dr. Desmond Martello,[8] a licensed chiropractor, testified that plaintiff's treatment records included a patient history that revealed that plaintiff was injured on September 29, 2004, when pushing bundles of insulation at work and reported the injury to Frank Pesek.

---

[7]Dr. Elborno's first name is not in the record on appeal.

[8]Martello's testimony was presented by reading the transcript of a videotaped evidence deposition in open court, but the video was not played before the jury.

-14-

¶ 76                                    3. Dr. Thomas Cronin

¶ 77        Dr. Thomas Cronin, a general surgeon practicing in occupational medicine, evaluated plaintiff on January 22, 2005, and testified that the "triggering event" from plaintiff's "history and mechanism of injury" was "pushing this 2,000 pounds of rubber with eight other people." After evaluating plaintiff and examining his MRI, Cronin concluded that "number one, he had chronic low back syndrome, which means low back pain, on a continuing basis. That was number one. Number two, he had what's known as spondylolisthesis, which is a slippage of the vertebrae, one on the other, with radiculopathy, which is pain down the leg in his case at the L5-S1 level. The third thing was he had a herniated disc at the lumbar three, lumbar four area, and the lumbar four, lumbar five area with encroachment upon the left lateral recess at both levels, which means, in common terms, a pinched nerve, but that can be extremely uncomfortable." Cronin opined that plaintiff needed further treatment by a specialist because he had a "long measure of tenderness" down his spine and had "considerable limitation of motion" and numbness and tingling on his legs; plaintiff was also "notably uncomfortable" while in Cronin's office and had difficulty during the examination during tests such as straight-leg-raising and heel-to-toe tests. Cronin opined that plaintiff needed to visit a spine surgeon, "either an orthopedist or a neurosurgeon that does that type of surgery." In his report, Cronin opined that plaintiff "was not able to do any heavy lifting, no repeated bending or twisting, only light work with a restriction of five to ten pounds of lifting would be advisable."

¶ 78                                    4. Dr. Sean Salehi

¶ 79        Dr. Sean Salehi,[9] a physician board-certified in neurological surgery, testified that he treated plaintiff from April 14, 2005, to February 27, 2007, and performed spinal surgery on him on October 17, 2005. Salehi first examined plaintiff at the neurosurgery clinic at Northwestern University Hospital on April 4, 2005. Plaintiff reported that "he was injured at work in September by pulling a 2,000 pound object with the help of other coworkers. At the time he had immediate low back pain and also left leg pain." Salehi opined that plaintiff "was having fracture of his L5 vertebrae on the backside. He also had degeneration of the discs in the low back and also stenosis of his lower back causing his complaints of back and leg pain, and I wanted to put him through [a] conservative course of care," meaning nonsurgical care.

¶ 80        Plaintiff next visited Salehi on July 8, 2005, and was still experiencing back and leg pain; the conservative course of care had not relieved his pain at all. Salehi recommended proceeding with a lumbar fusion operation to stabilize the spine, and performed a transforaminal lumbar interbody fusion on October 17, 2005. As of January 17, 2006, three months after surgery, plaintiff's left leg pain was still present but significantly improved, and he complained of low back stiffness when rolling in bed, which was not an unusual

_____

[9]Salehi's testimony was presented in the form of a videotaped evidence deposition, the transcript of which is included in the report of proceedings.

complaint.

¶ 81    Salehi testified that plaintiff visited him on April 11, 2006, six months after the operation, and was complaining of moderate low back and left leg pain, as well as neck pain when turning his head. Plaintiff underwent a functional capacity evaluation, and Salehi opined that he was capable of sedentary to light-duty work and was physically unable to return to his work as a roofer. On June 19, 2006, plaintiff was complaining of low back pain and intermittent left leg pain. A CT scan and MRI revealed that, while one level of the two-level fusion was a solid fusion, the other level had not yet healed. Salehi referred plaintiff for pain management and also made a recommendation for an epidural steroid injection.

¶ 82    The last time that Salehi examined plaintiff was on February 27, 2007, and plaintiff complained of low back and leg pain. The low back pain was constant and aggravated by any movement, and the leg pain traveled down the leg. Salehi opined that, if additional imaging showed no evidence of healing, plaintiff needed a second lumbar fusion to alleviate the symptoms and should receive further treatment from Dr. Edward Goldberg. Salehi opined that the cause of plaintiff's injury was "[t]he rolling of the 2,000 pound object" and that plaintiff was not physically capable of returning to his work as a roofer as of February 2007.

¶ 83                          5. Dr. Edward Goldberg

¶ 84    Dr. Edward Goldberg,[10] a board-certified orthopedic spine surgeon who treated plaintiff from August 2005 to April 2012, testified that he first met plaintiff on August 15, 2005, when "[h]e reported that he was working for Sullivan Roofing, injured himself on or about October 6 of 2004 when he was pushing and lifting bundles of insulation. He developed low back and left leg pain." Goldberg performed a physical exam and reviewed plaintiff's radiographic images; Goldberg tentatively opined that plaintiff had "aggravated a spondylolisthesis at L5-S1." At that time, plaintiff's treating physician, Dr. Salehi, was recommending surgery, and Goldberg concurred with that recommendation; plaintiff visited Goldberg for a second opinion.

¶ 85    Plaintiff was then examined by Goldberg on October 30, 2006, postsurgery, in order to assess his clinical condition. Plaintiff continued to complain of low back pain and an ongoing left leg radicular pain. Goldberg reviewed plaintiff's postoperative films on November 1, 2006, and opined that plaintiff's fusion had not healed at either L4-L5 or L5-S1. At that point, plaintiff had two options: live with the symptoms or repeat the surgery to obtain a solid fusion.

¶ 86    On August 3, 2007, plaintiff was still symptomatic, complaining of low back pain and some numbness in both lower extremities. On August 28, 2007, Goldberg performed the repeat surgery. Postsurgery, plaintiff's back pain improved, but he still had some persistent left leg radiculitis that had been present even before Salehi's initial surgery. Plaintiff underwent physical therapy and had a work evaluation, and ultimately, his fusion healed.

---

[10]Goldberg's testimony was presented in the form of a videotaped evidence deposition, the transcript of which is included in the report of proceedings.

Plaintiff had a functional capacity evaluation at a facility called ATI, which was performed by Jaime Rojas; the evaluation indicated that plaintiff was working at a light physical demand level. At the time of his evaluation, Goldberg classified plaintiff's recovery as maximum medical improvement. Goldberg opined that plaintiff was not capable of going back to work as a roofer, which was a heavy-demand level job.

¶ 87    Plaintiff was last examined by Goldberg on April 23, 2012, approximately a week and a half prior to his testimony, and plaintiff "complained of some dull low back pain, some pain into the left buttock and proximal left hamstring, in other words, the backside of the upper thigh." Plaintiff was still at maximum medical improvement. During his last visit, Goldberg opined that the fusion was healed at both L4-L5 and L5-S1, with very mild disc degeneration at L3-L4. Goldberg opined that plaintiff could expect the residual effects of his injury to be of a permanent nature; he opined that plaintiff "will intermittently have some dull low back pain, still some of the pain, numbness in the left buttock into the hamstring." Goldberg further opined that plaintiff "was injured at work. He had aggravation of an asymptomatic spondylolisthesis of L5-S1 and degenerative disc with spinal stenosis at L4-5."

¶ 88                                6. Jaime Rojas

¶ 89    Jaime Rojas,[11] a certified licensed athletic trainer, testified that he was formerly the clinical director of ATI Physical Therapy (ATI), where he performed a functional capacity assessment of plaintiff on July 9, 2008. Rojas testified that he had performed a number of functional capacity assessments for roofers, and he characterized roofing as a heavy physical demand level job.

¶ 90    Rojas testified that plaintiff was referred to ATI by Dr. Goldberg, who requested that they perform a functional capacity assessment. Rojas explained the process of performing the assessment: first, the client filled out a 164-question questionnaire "to determine where they feel that they're at at that moment," which took approximately an hour to complete. Rojas did not have a copy of the questionnaire during his deposition, and no questionnaire was ever provided to defendant by ATI. However, Rojas testified that the contents of the questionnaire were not important to the assessment and "we don't really go through that questionnaire." Instead, while the client was completing the questionnaire, Rojas would be watching him in order to observe whether he was uncomfortable sitting or shifting, "just due to the fact they might have some pain, discomfort, what have you. We don't tell them that we're looking at that, but that's what we are watching for within that hour." In addition to assessing the client's sitting tolerance, Rojas also assessed the client's standing and walking tolerance, as well as his endurance in terms of bending, squatting, crawling, and kneeling. Rojas also assessed the client's lifting tolerance at three levels  desk to chair height, chair to floor height, and above shoulders  and assessed the client's ability to push, pull, and carry.

¶ 91    Rojas opined that plaintiff was demonstrating full effort during his evaluation, but was only able to demonstrate the ability to perform work at a light physical demand level, lifting

[11]Rojas' testimony was presented in the form of a videotaped evidence deposition conducted via telephone, the transcript of which is included in the report of proceedings.

approximately 32 pounds occasionally; the light physical demand level meant that he could occasionally lift approximately 20 pounds. Rojas explained that the assessment did not make any representations about plaintiff's ability to return to work and that "[u]ltimately, it's up to the doctor's discretion to do that. We're just stating that this is what we saw on that particular day, you know, we feel that he can do according to our functional capacity assessment, we feel like he can do a light physical demand level job." After the evaluation, plaintiff was returned to Dr. Goldberg, and Rojas did not have any further contact with him.

¶ 92                    C. Safety and Damages Witnesses

¶ 93                        1. Dennis Puchalski

¶ 94    Dennis Puchalski, a construction safety expert, testified that he was a former safety inspector with OSHA, as well as having jobs as a construction safety supervisor with the Illinois Toll Highway Authority and other construction safety jobs. Puchalski was also a member of the National Safety Council, Construction Section, and the American Society of Safety Engineers, Construction Section, and was currently a construction safety litigation consultant.

¶ 95    Puchalski testified that "the general contractor has to enforce safety. They're the ultimate controlling contractor on the work site." Puchalski further testified that defendant had the obligation to ensure safe work procedures on the roof and had an obligation to supervise, inspect, and coordinate the work involved, as well as proactively interceding if it observed unsafe work practices. As an expert in construction safety, Puchalski opined that defendant "did violate OSHA and customs and practices in that you're allowing unsafe material handling." Puchalski pointed to the moving of heavy rubber membrane "[a]nd the custom and practice is when you have heavy, heavy weights that you use mechanical means ***. *** But at the time of the incident these weren't being used and you're doing manual material handling over decking," which could be slippery. Puchalski further opined that defendant violated the Association of General Contractors manual on accident prevention in that, "when you're not planning for proper material handling and then you don't control it to ensure i[t] then, yes, it's violated."

¶ 96    Puchalski testified that, pursuant to the contract between defendant and the property owner, defendant was "solely responsible for the construction, means, methods, techniques, sequences and procedures and to coordinate all portions of the work."

¶ 97    On cross-examination, Puchalski admitted that neither defendant nor Sullivan Roofing was cited for OSHA violations as a result of the accident. Puchalski opined that the number of men pushing the roll of rubber membrane was irrelevant, because the fact that it was being pushed manually violated OSHA.

¶ 98                        2. Thomas Hutchinson

¶ 99    Thomas Hutchinson, an architect and licensed roof consultant, testified that he was an expert in the design and installation of roofing systems such as the one involved in the Wilton project. Hutchinson testified that when the rubber membrane used in the Wilton

project first came into use, the membrane was rolled manually across the roof; the circular nature of the roll permitted momentum to unroll the membrane, once it had been started with a push. However, with the advent of supersize projects and large warehouses, contractors began using mechanical means of unrolling the membrane in order to be more efficient; ATVs began being used in approximately 2000. Hutchinson testified that, "even today," rubber membrane was often rolled manually, because contractors did not have the means to put ATVs on the roof or the roof was too small.

¶ 100    Hutchinson testified that "[t]here are several means and methods and customs and practices in regards to moving just the membrane across the roof." The first was the "traditional way," in which a group of crew members would stand behind the membrane and push the roll. The other option was the "bump and roll," using mechanical means. Hutchinson testified that, even using mechanical means, worker would still need to manually move the roll somewhat, since the roll needed to be in a position where the ATV could roll it.

¶ 101                                    3. David Gibson

¶ 102    David Gibson, senior analyst for Vocational Services, Inc., testified that his work involved understanding the ways in which a disability interfered with a person's ability to perform work in the United States labor market, as well as projecting a person's earnings before and after a given event in order to determine in dollars what loss the person incurred as a result of the event.

¶ 103    Gibson testified that, based on an interview with plaintiff and a review of plaintiff's medical and employment records, plaintiff had six years of formal education and been employed as a roofer since 1989 and had planned on continuing in that line of work until retirement. However, plaintiff had significant pain, which impacted him in his ability to walk, stand, sit, lift, and bend, as well as his abilities to crouch, crawl, balance, and climb stairs or ladders. Plaintiff's overall strength limitation was approximately 20 pounds and his back limitations impacted his ability to reach above his head.

¶ 104    Gibson testified that the functional capacity evaluation that plaintiff had undergone was important to his analysis, since it measured plaintiff's ability to lift. Gibson explained that lifting was a key component of many manual labor jobs, and that "[t]he less education a person has, the more likely they are to have to work in manual labor type jobs."

¶ 105    Gibson testified that plaintiff's restrictions "essentially limited him to sedentary employment," which painted a "very bleak picture," since sedentary jobs were largely skilled in nature. However, plaintiff "has no transferable skills. The skills that he had were all very important skills and well paying skills, but they're specific to a job that he did as a roofer that he can no longer do due to the strength requirement." Consequently, "the percentage of jobs that he has available to him to apply against in the U.S. labor market is less than one percent." Gibson further noted that many sedentary jobs require fluency in English, which plaintiff did not have, further diminishing his access to the labor market.

¶ 106    Gibson testified that plaintiff's pre-injury average annual income was approximately $57,848 in base salary using a calculation based on the three years prior to the accident, and

was approximately $55,419 using a five-year calculation. His work life expectancy from the date of injury would have been 18.5 years. After his injury, plaintiff had no substantial likelihood of having further gainful employment and had a work life expectancy of zero.

¶ 107    Gibson testified that, based on his annual income and including fringe benefits, plaintiff's lifetime loss from his injury would be $1,166,244 in present cash value using the five-year average and $1,214,252 using the three-year average. Further, Gibson testified that plaintiff's pension was reduced by $118,423 in present cash value due to his injury. Including the pension loss, the total present cash value of plaintiff's losses was $1,284,667 using the five-year average and $1,332,675 using the three-year average.

¶ 108                           D. Jury Instructions and Verdict

¶ 109    The jury was given the following instruction concerning liability of a general contractor over defendant's objection:

> "A contractor who entrusts work to a subcontractor can be liable for injuries resulting from the work if the contractor retains some control over the safety of the work and if the injuries were proximately caused by the contractor's failure to exercise that control with ordinary care."

¶ 110    On May 11, 2012, the jury completed "Verdict Form B," finding in favor of plaintiff and against defendant and that the amount of damages suffered by plaintiff was $1.985 million. The jury further found:

> "Assuming that 100% represents the total combined legal responsibility of all persons or entities that proximately caused Teodoro Ramirez's injury, we find the percentage of legal responsibility attributable to each as follows:
>
> > a) Teodoro Ramirez 20%
> >
> > b) FCL Builders, Inc. 40%
> >
> > c) Sullivan Roofing, Inc. 40%."

Finally, reducing plaintiff's total damages by the percentage of contributory negligence attributable to plaintiff, the jury awarded plaintiff damages in the amount of $1.588 million. The court entered judgment on the jury's verdict.

¶ 111    On July 11, 2012, after obtaining an extension of time, defendant filed a posttrial motion in which it renewed its motion for a directed verdict, moved the court to vacate the May 11, 2012, judgment, and requested judgment notwithstanding the verdict in defendant's favor or, in the alternative, a new trial. On November 6, 2012, the trial court denied defendant's motion in a written order. The court found that there was sufficient evidence for the jury to have concluded that defendant exercised sufficient control over the aspect of Sullivan Roofing's work that caused plaintiff's injury. The court further found that the verdict form was appropriate, and that the other errors asserted by defendant were insufficient to require a new trial or judgment notwithstanding the verdict.

¶ 112                                    ANALYSIS

¶ 113    On appeal, defendant argues that (1) the trial court erred in not granting a judgment notwithstanding the verdict in favor of defendant, where defendant had no liability for plaintiff's injuries as a matter of law; and, alternatively, (2) the trial court should have granted defendant a new trial where the trial court improperly instructed the jury, made errors in the admission of evidence, and failed to sanction plaintiff for several discovery violations.

¶ 114                          I. Judgment Notwithstanding the Verdict

¶ 115    Defendant first argues that the trial court erred in failing to enter a judgment notwithstanding the verdict in defendant's favor because defendant had no liability for plaintiff's injuries as a matter of law. Defendant argues both that it did not know of any unsafe work practice on the part of Sullivan Roofing and that it did not exercise sufficient control over the work site to expose it to liability for plaintiff's injury.

¶ 116    Judgments notwithstanding the verdict are proper only where all the evidence viewed most favorably to the opponent so overwhelmingly favors the movant that no contrary verdict could ever stand. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). It is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses and to decide what weight should be given to the witnesses' testimony. *Maple*, 151 Ill. 2d at 452. On review of a trial court's decision to deny a motion for a judgment notwithstanding the verdict, all of the evidence must be reviewed in a light most favorable to the opponent of the motion. *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 353-54 (1992). A court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, it may only consider the evidence and any inferences therefrom in the light most favorable to the party resisting the motion. *Mizowek v. De Franco*, 64 Ill. 2d 303, 309-10 (1976). A judgment notwithstanding the verdict is not appropriate if "reasonable minds might differ as to the inferences or conclusions to be drawn from the facts presented." *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995).

¶ 117              A. Section 414 of the Restatement (Second) of Torts

¶ 118    In the case at bar, plaintiff's theory of recovery is grounded in common-law negligence. "The essential elements of a cause of action based on common-law negligence are the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach." *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 873 (2005) (citing *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990)). Here, defendant's arguments focus on the duty element.

¶ 119    "Generally, one who employs an independent contractor is not liable for the latter's acts or omissions." *Joyce v. Mastri*, 371 Ill. App. 3d 64, 73 (2007) (citing *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 204-05 (2005)). However, section 414 of the Restatement (Second) of Torts (1965), "which has long been recognized as an expression of law in Illinois," provides an exception to the general rule, referred to as the "retained control" exception. *Cochran*, 358 Ill. App. 3d at 873-74 (citing *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 325 (1965)); *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 47.

¶ 120    Section 414 provides:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

¶ 121    "The Restatement describes a continuum of control, explaining [that] the employer is subject to liability as master under the principles of agency where the employer retains control over the operative detail of any part of the contractor's work. [Citation.] If the employer retains only supervisory control, *i.e.*, power to direct the order in which work is done, or to forbid its being done in a dangerous manner, then the employer is subject to liability under section 414 unless he exercised supervisory control with reasonable care." *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 314 (2004) (citing Restatement (Second) of Torts § 414, cmt. a (1965)). Thus, "[a]s comment *a* to section 414 clarifies, the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care." *Cochran*, 358 Ill. App. 3d at 874.

¶ 122    However, the "retained control" concept is limited by comment c to section 414:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c (1965).

Thus, negligence and, specifically, the existence of a duty under section 414 "turn[ ] on whether the defendant controls the work in such a manner that he should be held liable." *Martens*, 347 Ill. App. 3d at 315; *Calloway*, 2013 IL App (1st) 112746, ¶ 50. "Whether a contractor retained such control over a subcontractor's work so as to give rise to liability is an issue reserved for a trier of fact, unless the evidence presented is insufficient to create a factual question." *Joyce v. Mastri*, 371 Ill. App. 3d 64, 74 (2007) (citing *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1059 (2000)). In the case at bar, defendant argues that plaintiff failed to prove control sufficient for either direct or vicarious liability under section 414.

¶ 123                    B. Vicarious Liability Under Section 414

¶ 124    As noted, "the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence" pursuant to section 414. *Cochran*, 358 Ill. App. 3d at 874. In the case at bar, defendant argues that "[t]he evidence in the case at bar shows no hands-on involvement by [defendant] in the

-22-

incidental or operational aspects of Sullivan Roofing's work," emphasizing that, "at most, its directive to Sullivan Roofing was, essentially, 'Stop damaging the client's roof decking.'" Defendant further argues that it was never involved in the manner in which Sullivan Roofing did its work and did not order Sullivan Roofing to stop using ATVs.

¶ 125 We note that, in considering the denial of a motion for judgment notwithstanding the verdict, we do not weigh the evidence, nor are we concerned with the credibility of the witnesses; rather, we may only consider the evidence and any inferences drawn therefrom in the light most favorable to plaintiff. *Mizowek*, 64 Ill. 2d at 309-10. Additionally, a judgment notwithstanding the verdict is proper only where all the evidence viewed most favorably to the opponent so overwhelmingly favors the movant that no contrary verdict could ever stand. *Maple*, 151 Ill. 2d at 453. Here, considering the evidence in the light most favorably to plaintiff, we cannot find that the evidence so overwhelmingly favored defendant that no contrary verdict could ever stand.

¶ 126 There was evidence presented at trial that defendant had the right to control the safety of the work at the Wilton project and exercised that right by controlling operative details of Sullivan Roofing's work when (1) defendant noticed the damage to the decking and ordered work to stop; (2) defendant participated in finding a solution to the problem; and (3) defendant ordered the use of ATVs to cease, resulting in the workers' manually pushing the rolls of rubber membrane. The jury could reasonably have found that this conduct was sufficient to demonstrate that defendant retained a level of control over Sullivan Roofing's work to give rise to liability. See *Joyce*, 371 Ill. App. 3d at 74 ("Whether a contractor retained such control over a subcontractor's work so as to give rise to liability is an issue reserved for a trier of fact, unless the evidence presented is insufficient to create a factual question." (citing *Bokodi*, 312 Ill. App. 3d at 1059)).

¶ 127 First, Michael Sullivan, Sullivan Roofing's safety director at the time of plaintiff's injury, testified that, prior to beginning work on the Wilton project, Sullivan Roofing received a "welcome subcontractor type letter" from defendant, in which defendant indicated that it was "committed" to Sullivan Roofing's safety and wanted to provide a workplace "reasonably free of recognized safety hazards," which Sullivan testified was "very common" on a project of the scope of the Wilton project. The letter further stated that "safety and safety awareness is a two-way street," which Sullivan agreed with, testifying that "[e]verybody on site is responsible for safety," including the general contractor, subcontractor, and employees. Sullivan also testified that, on the Wilton project, defendant had certain "intolerable offenses," which meant that "generally the subcontractor has to behave in a certain fashion or they're gone."

¶ 128 Sullivan testified that John Zelasco had the authority to stop work on the project if he observed unsafe practices and further testified that "FCL is very strict on safety. So that's more you know, anything that happens, John has the right. He runs the job. He has the right to stop." If Zelasco observed someone performing his job in an unsafe manner, Zelasco would have the right to stop that work and then would contact Sullivan. Zelasco would also coordinate the work and monitor the work of the subcontractors.

¶ 129 Sullivan testified that when roofing materials were hoisted onto the roof of the Wilton

-23-

project, the materials were "dimpling" or denting the deck, and a solution needed to be provided by "the powers that be." Sullivan testified that "I believe John [Zelasco] called me" and informed him of the problem with the decking. Sullivan testified that ATVs were used on the Wilton project and were only temporarily stopped: "That was a decision made at the point in time all this happened, to stop everything, and we had to figure out a way that we could use them again and get things rolling and be able to load so we wouldn't damage the deck."

¶ 130 At a meeting between Sullivan and David Majestic, they "came up with a plywood runway solution," which would use a plywood runway system to distribute the weight of the heavy roofing materials and permit the ATVs to be used, and "posed that to John to help to protect the roof." Sullivan further testified that "after a conference between John and the powers that be at Sullivan, that was a solution that was implemented."

¶ 131 Thus, after hearing Sullivan's testimony and making reasonable inferences therefrom, the jury could have reasonably concluded that defendant had at least some control over the safety of the work; ordered Sullivan Roofing's work, including the use of ATVs, to stop when it was damaging the roof; and approved Sullivan Roofing's proposed solution of using a plywood runway system.

¶ 132 Next, David Majestic, vice president of field operations for Sullivan Roofing, testified that defendant's superintendent, John Zelasco, placed a call to Sullivan Roofing informing it of damage to the decking; defendant had the right to stop the work if Sullivan Roofing was damaging the roof. The problem required the work to stop until a solution was developed, and Majestic testified that the decision to use plywood to solve the problem was a collaboration between Sullivan Roofing and defendant. Thus, after hearing Majestic's testimony and making reasonable inferences therefrom, the jury could have reasonably concluded that defendant had some control over the work being performed on the roof, ordered the work to stop until a solution was developed, and participated in the decision to use plywood.

¶ 133 Additionally, Frank Pesek, the roofing foreman for Sullivan Roofing on the Wilton project, testified that, on a job the size of the Wilton project, ATVs would be used to push rolls of rubber membrane to various points on the roof; the ATVs had been used "since day one when I was here" and Sullivan Roofing "always used the ATVs" to move rolls of membrane significant distances "because it's easier" on the workers' bodies.

¶ 134 Pesek testified that he was notified by "[s]omeone from [defendant] FCL" that there was damage to the roof decking and he "took a timeout to craft a solution to this deck damage issue." Pesek could not recall whether someone gave an order not to use ATVs, but "if we stopped using the Hondas, it's because someone told me not to use them." Pesek agreed that "it was more likely than not that there was an order to not use the Hondas to push the rolls," and he testified that "the order to not use the Hondas either came from Dave Majestic or the [defendant's] superintendent on this job." Pesek further testified that Majestic would not call Pesek "out of the blue" and order him to stop using the ATVs and testified that defendant had the power to halt the work that Sullivan Roofing was performing.

¶ 135 Pesek testified that once the ATVs were not allowed to push the rolls, the rolls of

membrane would have to be manually pushed by the crew. Pesek "would rather use Hondas," but he did not view anything unsafe in manually rolling the rubber membrane, providing there were enough workers doing so, and ordered his crew to manually move the rolls. Finally, Pesek testified that there was a plywood runway system in place to permit the ATVs to transport bundles of insulation but they were not in place at that point in time to permit the ATVs to move the rolls of rubber membrane.

¶ 136   Thus, after hearing Pesek's testimony and making reasonable inferences therefrom, the jury could have reasonably concluded that defendant had some control over Sullivan Roofing's work and ordered the work halted over the damage to the decking. Furthermore, the jury could have reasonably concluded that defendant ordered the use of ATVs in pushing rolls of rubber membrane to cease, meaning that the workers would need to manually move them, something that Sullivan Roofing did not normally do of its own accord.

¶ 137   Next, John Zelasco, defendant's project superintendent on the Wilton project, testified that he was present on the site on a daily basis. Zelasco, as a superintendent, "had the power to stop work on this job generally" and one of his duties for defendant on a given project was to ensure that the work site was safe. Zelasco also testified about defendant's list of "intolerable offenses" by subcontractors, which were "certain job rules that are strictly enforced," and testified that violation of the rules could result in immediate and permanent removal of the subcontractor from the project. Zelasco testified that "[e]veryone has to work as a team" to ensure a safe work site and that "we're committed to everyone's safety on the job site."

¶ 138   Zelasco testified that, on the first day that roofing materials were loaded onto the roof, he noticed that roofing activity was creasing the decking and notified Pesek and Sullivan. Zelasco also testified that it was a joint decision between defendant and Sullivan Roofing to cease working for a day to assess the damage.

¶ 139   Zelasco testified that it was very common for roofers to use ATVs on a roof and that it would be highly unusual not to use ATVs on a roof the size of the Wilton project. Zelasco testified that Sullivan Roofing had unrestricted use of ATVs to move its materials and that "I never gave any restrictions on the means and methods of the contractor to do his job." He admitted that he and Majestic, from Sullivan Roofing, would have the authority to tell Pesek to stop using the ATVs if they were damaging the deck.

¶ 140   Zelasco observed membrane used on a number of roofs and that, "[t]ypically, it's moved from the truck with a crane up onto the roof. And then very typically the roofers themselves, usually five or more guys, will get behind it and push it into position, getting it either rolled up onto a cart or onto some means of transporting it where it needs to go. But it's always  it's usually done manually when they're stocking the job." Once they were rolled onto the cart or ATV, the rolls would be transported to their final destination on the roof.

¶ 141   Thus, after hearing Zelasco's testimony and making reasonable inferences therefrom, the jury could have reasonably concluded that defendant had control over the safety of the work site and had the power to stop work, and that defendant in fact ordered the roofing work to stop. Furthermore, the jury could have reasonably concluded that Zelasco knew that ATVs were normally used to move rolls of rubber membrane and that the other alternative was

moving the rolls manually.

¶ 142    Finally, plaintiff's brother testified that, on the day of plaintiff's injury, the crew was ordered not to use ATVs to push the rolls by someone wearing a white hard hat,[12] so plaintiff was moving them manually, and plaintiff testified that he was not permitted to use ATVs to push the rolls of rubber membrane "[b]ecause some guy told us don't use the Hondas"; plaintiff testified that the man who told the workers not to use the ATVs was John Zelasco. Pesek then ordered them to roll the membrane manually, and the ATVs were only used to move bundles of insulation. Plaintiff testified that it was unusual to manually move the rolls 300 feet and that "[a]ll the time we use the Hondas." Thus, after hearing testimony from plaintiff and his brother and making reasonable inferences therefrom, the jury could have reasonably concluded that defendant ordered the workers to stop using ATVs to move the rolls of rubber membrane, resulting in the order to move the membrane manually.

¶ 143    In sum, taking all evidence in the light most favorable to plaintiff as the nonmovant, the jury could have reasonably concluded that: defendant had a degree of control over work site safety and had the power to stop the work; defendant did stop the work when damage to the decking was discovered; defendant participated in finding a solution to the problem; and defendant ordered the use of ATVs to stop, despite being aware that the alternative was to manually push the rolls of rubber membrane, a decision that directly led to plaintiff's injury. The jury could have reasonably found that this conduct was sufficient to demonstrate that defendant retained a level of control over Sullivan Roofing's work so as to give rise to liability, especially since the control exercised by defendant was control over the method and means of rolling membrane, an operative detail of Sullivan Roofing's work. See *Joyce*, 371 Ill. App. 3d at 74 ("Whether a contractor retained such control over a subcontractor's work so as to give rise to liability is an issue reserved for a trier of fact, unless the evidence presented is insufficient to create a factual question." (citing *Bokodi*, 312 Ill. App. 3d at 1059)). The jury hears the evidence and decides the credibility of the witnesses and the weight to be given to their testimony. *Maple*, 151 Ill. 2d at 452. In the case at bar, this jury believed the versions testified to by Pesek, plaintiff, and his brother, and we cannot say that all of the evidence viewed most favorably to the opponent so overwhelmingly favors the movant that no contrary verdict could ever stand. *Maple*, 151 Ill. 2d at 453.

¶ 144    We find the cases relied on by defendant to be factually distinguishable. For instance, in *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 839-40 (1999), we affirmed the grant of summary judgment in a general contractor's favor, finding that the general contractor owed no duty to the subcontractor's employee. In that case, Rangel, the employee, was injured after falling from scaffolding that had been constructed by Drywall, the subcontractor, two days earlier. *Rangel*, 307 Ill. App. 3d at 837. Rangel brought suit against Brookhaven, the general contractor, alleging that Brookhaven owed Rangel a duty of care, which it breached by failing to inspect the scaffold or warning him of the dangerous condition the scaffold presented. *Rangel*, 307 Ill. App. 3d at 837.

---

[12]Pesek, the foreman for Sullivan Roofing, testified that defendant's employees wore white hard hats.

-26-

¶ 145 We upheld the trial court's grant of summary judgment in Brookhaven's favor, finding that "[t]here is no evidence to suggest that Drywall was not entirely free to perform the work in its own way. The evidence showed Brookhaven never directed the 'operative details' of the work performed by Drywall and Rangel. Drywall, not Brookhaven, supplied the scaffold on which Rangel worked. A Drywall supervisor, not Brookhaven, directed Rangel to utilize the braces when necessary for positioning the drywall. This unsafe method of performing the work, which led to Rangel's injury, was proposed by Rangel's employer just hours before the accident." *Rangel*, 307 Ill. App. 3d at 839. Thus, we concluded that, since " '[the employer] controlled the ends, [the independent contractor] was responsible for the means by which those ends were achieved,' " there could be no liability imposed on Brookhaven. *Rangel*, 307 Ill. App. 3d at 839 (quoting *Fris v. Personal Products Co.*, 255 Ill. App. 3d 916, 924 (1994)).

¶ 146 Similarly, in *Joyce*, we affirmed the trial court's grant of summary judgment in a general contractor's favor where the employee of a subcontractor was injured while using a ladder that malfunctioned. There, the ladder was provided by another subcontractor and the general contractor did not provide any equipment or have any contact with the employee. *Joyce*, 371 Ill. App. 3d at 68. We upheld the trial court's grant of summary judgment, finding that "the facts indicate that Madison Services did not control EGM's work. There is no evidence that Madison Services directed the 'operative details' of the work site or that EGM was not free to perform the demolition work in its own way. The evidence showed that Madison Services did not participate in or supervise any of the demolition work. Reinersman, on behalf of Madison Services, visited the work site at the beginning of the project merely to inform EGM of the scope of work and any subsequent visits were to monitor the progress of the work. Reinersman did not direct EGM employees as to the operative details as to how to perform their work and did not give any job assignments to EGM's employees. The evidence showed that Olson, EGM's superintendent, ran the job and that EGM's workers were supervised by its lead man, Jerry Johansen. Olsen himself testified that Madison Services did not supervise EGM's work and that EGM workers would go to him if they had any type of problems." *Joyce*, 371 Ill. App. 3d at 75-76.

¶ 147 Finally, in *Cochran*, we affirmed the trial court's grant of summary judgment in the general contractor's favor where a subcontractor's employee was injured when falling off a ladder set up in an unsafe manner; the equipment was provided by the subcontractor and the employee received work instructions from the subcontractor. *Cochran*, 358 Ill. App. 3d at 867-68. We found that there was no basis for vicarious liability "because no evidence was presented that [the general contractor] so controlled the operative details of [the subcontractor's] work that [the subcontractor's] employees were not entirely free to perform the work in their own way." *Cochran*, 358 Ill. App. 3d at 879.

¶ 148 In the case at bar, by contrast, there was evidence that defendant involved itself in the operative details of the roofing work. Contrary to defendant's assertion that, "at most, its directive to Sullivan Roofing was, essentially, 'Stop damaging the client's roof decking,' " there was evidence presented that defendant had a role in ordering the work to stop, in implementing a solution to the damage issue, and in ordering the use of ATVs to stop, leading to the workers' manually pushing the rolls of rubber membrane. Thus, we find

-27-

defendant's cases inapposite and affirm the trial court's denial of defendant's motion for judgment notwithstanding the verdict.

¶ 149                    C. Direct Liability Under Section 414

¶ 150    Defendant also argues that there was no evidence that it was directly liable for plaintiff's injuries under section 414. As noted, "the general contractor may be directly liable for not exercising his supervisory control with reasonable care," even in the absence of control sufficient to subject the general contractor to vicarious liability. *Cochran*, 358 Ill. App. 3d at 874. Here, defendant argues that plaintiff did not prove direct liability under section 414 because (1) plaintiff did not prove an unsafe work method and (2) plaintiff did not prove that defendant was on notice of the alleged unsafe work method. "According to comment *b* to section 414, the general contractor's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability." *Cochran*, 358 Ill. App. 3d at 879-80. Thus, in *Cochran*, we found that the general contractor was not directly liable for a worker's injury in falling off an unsafe ladder where the unsafe condition was in existence for an hour at most and the general contractor had no knowledge of the unsafe condition. *Cochran*, 358 Ill. App. 3d at 880.

¶ 151    In the case at bar, there was sufficient evidence for the jury to conclude that defendant was directly liable for plaintiff's injury. First, there was evidence that manually moving the rolls was an unsafe work method. Puchalski testified that manually moving rolls of rubber membrane was unsafe, and all of the roofing witnesses testified that using an ATV was preferable to manually moving the rolls. The jury could have found Puchalski credible and determined that manually moving the rolls was an unsafe work method.

¶ 152    Additionally, there was testimony that defendant was aware of the unsafe work method through its order to stop using the ATVs. Again, we note that, although there was contradictory testimony over who ordered the workers to stop using the ATVs, our review must take the evidence in the light most favorable to plaintiff. Pesek testified that, once the use of ATVs was stopped, the membrane would need to be manually pushed by the crew. Plaintiff's brother also testified that plaintiff was moving rolls manually because the crew was ordered to stop the use of ATVs by someone wearing a white hard hat, and the evidence established that defendant's employees wore white hard hats. Plaintiff also testified that Zelasco ordered the workers to stop using ATVs, resulting in them pushing the rolls manually. Furthermore, since Sullivan Roofing was still required to work despite being ordered not to use the ATVs, a reasonable inference would be that the workers would manually push the rolls.

¶ 153    Defendant argues that defendant did not know that the workers would push the rolls manually, and that Sullivan Roofing could have used the ATVs on the plywood runway system. However, there was evidence presented that cast doubt over whether the plywood runway system was implemented and whether it was used for rolling membrane. For instance, plaintiff testified that there was no plywood runway system in place and Pesek testified that the plywood runway system permitted ATVs to move insulation but could not be used to roll membrane.

¶ 154     Additionally, Hutchinson, defendant's expert, testified that the rolls could be moved in one of two ways: manually or through mechanical means. The jury could have inferred that, once the mechanical means were stopped, the manual method would need to be used. Finally, Zelasco testified that he had observed membrane used on a number of roofs and had observed workers both using ATVs and manually moving membrane. The jury could have inferred from Zelasco's testimony that Zelasco would have been aware that the result of stopping the use of ATVs would be the manual rolling of the membrane. Thus, we do not find defendant's argument persuasive and affirm the trial court's denial of defendant's motion for judgment notwithstanding the verdict.

¶ 155                                    II. New Trial

¶ 156     Defendant alternatively argues that the trial court should have granted defendant a new trial where the trial court improperly instructed the jury, made errors in the admission of evidence, and failed to sanction plaintiff for several discovery violations. Defendant also argues that the jury's verdict was against the manifest weight of the evidence.

¶ 157                       A. Jury Verdict Against Manifest Weight

¶ 158     First, defendant argues that the jury's verdict was against the manifest weight of the evidence, claiming that there was no evidence that defendant retained control of the roofing work. " '[O]n a motion for a new trial a [trial] court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992) (quoting *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976)). " 'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.' " *Maple*, 151 Ill. 2d at 454 (quoting *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089 (1990)). A trial court's ruling on a motion for a new trial will not be reversed except in those instances where it is affirmatively shown that it clearly abused its discretion. *Maple*, 151 Ill. 2d at 455 (citing *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 548 (1981)); *Duffek v. Vanderhei*, 81 Ill. App. 3d 1078, 1087 (1980); *Prange v. Wallenburg*, 27 Ill. App. 3d 618, 626 (1975); *Yocco v. Barris*, 16 Ill. App. 3d 113, 115 (1973). In determining whether a trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by evidence and whether the losing party was denied a fair trial. *Maple*, 151 Ill. 2d at 455 (citing *Reidelberger*, 83 Ill. 2d at 549). Furthermore, it is important to keep in mind that " ' "[t]he presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." ' " *Maple*, 151 Ill. 2d at 456 (quoting *Buer v. Hamilton*, 48 Ill. App. 2d 171, 173-74 (1964), quoting *Hulke v. International Manufacturing Co.*, 14 Ill. App. 2d 5, 47 (1957)). If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion

for a new trial. *Maple*, 151 Ill. 2d at 456 (citing *Kitsch v. Goode*, 48 Ill. App. 3d 260, 270-71 (1977)); *Morella v. Melrose Park Cab Co.*, 65 Ill. App. 2d 175, 181-83 (1965).

¶ 159　　In the case at bar, as noted, plaintiff's theory of recovery is grounded in common-law negligence. "The essential elements of a cause of action based on common-law negligence are the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach." *Cochran*, 358 Ill. App. 3d at 873 (citing *Ward*, 136 Ill. 2d at 140). However, defendant's arguments concerning the jury's verdict concern only the duty element. Here, we cannot find that the jury's verdict was against the manifest weight of the evidence.

¶ 160　　As explained in the previous section, the jury could properly have determined that defendant owed a duty to plaintiff pursuant to section 414 of the Restatement (Second) of Torts, based on the testimony of the witnesses at trial. Accordingly, we cannot find that the jury's verdict was against the manifest weight of the evidence and affirm the trial court's denial of defendant's motion for a new trial.

¶ 161　　　　　　　　　　　　　　　　B. Jury Instructions

¶ 162　　Defendant next argues that the trial court erred in issuing certain jury instructions based on the Illinois Pattern Jury Instructions (IPI), claiming that they are not an accurate statement of the law. "Although jury instructions are generally reviewed for an abuse of discretion, our standard of review is *de novo* when the question is whether the applicable law was accurately conveyed." *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008) (citing *People v. Pierce*, 226 Ill. 2d 470, 475 (2007)); *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 163　　Illinois Supreme Court Rule 239(a) (eff. Jan. 1, 1999) states that a trial court "shall" use an IPI instruction when it is "applicable in a civil case, giving due consideration to the facts and the prevailing law, *** unless the court determines that it does not accurately state the law." A non-IPI instruction may be used if the IPI instruction does not accurately state the law. *Studt*, 2011 IL 108182, ¶ 14 (citing Ill. S. Ct. R. 239(b) (eff. Jan. 1, 1999)); *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002).

¶ 164　　However, even if the reviewing court determines that the trial court gave faulty instructions to the jury, reversal is not warranted unless the error results in " 'serious prejudice' " to the appellant's right to a fair trial. *Studt*, 2011 IL 108182, ¶ 28 (quoting *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007)); *Schultz*, 201 Ill. 2d at 274 ("A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant.").

¶ 165　　In the case at bar, the trial court gave the jury instructions based on the IPI. Specifically, the trial court gave the following instruction, based on Illinois Pattern Jury Instructions, Civil, No. 55.01 (2011) (hereinafter, IPI Civil (2011) No. 55.01):

　　　　"A contractor who entrusts work to a subcontractor can be liable for injuries resulting from the work if the contractor retains some control over the safety of the work and if the injuries were proximately caused by the contractor's failure to exercise that control with

-30-

ordinary care."

Defendant argues that this instruction did not accurately state the law because a general right to control safety is not sufficient to impose liability under section 414. We agree.

¶ 166    The committee comments to the 55.00 series indicate that, "[d]ue to the lack of consensus among the appellate courts and no Supreme Court cases on this subject since *Larson* [*v. Commonwealth Edison Co.*, 33 Ill. 2d 316 (1965)], the concept of 'control' caused the committee great difficulty." IPI Civil (2011) No. 55.00, Introduction, at 261. Consequently, "[t]he committee chose to concentrate on the area of 'safety' in these instructions. The committee believed that the overriding consideration throughout all of these cases is the ability of the controlling entity to affect overall job safety. It would appear that the ability to stop unsafe work and not permit it to be resumed until done to the satisfaction of the controlling entity satisfies both the requirement of 'control' and demonstrates that the contractor is 'not entirely free to do the work in his own way.' " IPI Civil (2011) No. 55.00, Introduction, at 261.

¶ 167    The committee's statement that "[i]t would appear that the ability to stop unsafe work and not permit it to be resumed until done to the satisfaction of the controlling entity" would bring the contractor under the purview of section 414 is likely an accurate statement of the law because, under that scenario, the contractor would have the power to affect the methods by which the subcontractor alleviated the safety problem. See, *e.g.*, *Calloway*, 2013 IL App (1st) 112746, ¶ 74 (general contractor's authority included right "to stop any work that they saw being done in an unsafe manner and to direct that the work be done in a different manner"); *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1063 (2000) (general contractor's authority included right to "shut down the work of the subcontractors until a safety breach was alleviated to defendants' satisfaction").

¶ 168    However, the language of IPI Civil (2011) No. 55.01 is broader than the scenario posed by the committee comments, requiring only that the contractor "retain[ ] *some* control over the safety of the work." (Emphasis added.) "Some" is defined as "[b]eing an unspecified number or quantity." American Heritage Dictionary 1164 (2d coll. ed. 1985). In other words, the pattern instruction requires the contractor to have retained an unspecified portion of the control over safety in order to be liable. Section 414, however, applies to "[o]ne who entrusts work to an independent contractor, but who retains *the* control of any part of the work." (Emphasis added.) Restatement (Second) of Torts § 414 (1965). "[A] principle of statutory construction is that 'the definite article "the" particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of "a" or "an." ' " (Emphasis omitted.) *Sibenaller v. Milschewski*, 379 Ill. App. 3d 717, 722 (2008) (quoting *Brooks v. Zabka*, 450 P.2d 653, 655 (Colo. 1969)). Section 414's use of the phrase "the control," then, implies that there is only one person or entity exercising control over a part of the work, something that is not true of the pattern instruction's requirement of "some control." Indeed, since the jury is not instructed as to the amount of control required, a jury could easily find that minimal control over safety is sufficient to hold a contractor liable. Thus, it is evident that IPI Civil (2011) No. 55.01 encompasses conduct that would not give rise to liability under section 414.

¶ 169      Furthermore, the IPI language does not include the explanation of "retained control" found in the comments to section 414. Comment c to section 414 specifically provides that "[i]t is not enough that [the contractor] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c (1965). However, under the language of IPI Civil (2011) No. 55.01, a jury could consider such a general right to be a retention of "some control over the safety of the work," since the jury is not further instructed as to what conduct constitutes control.

¶ 170      Additionally, as noted by defendant, our recent case law, not cited by the committee comments, consistently finds no control where there is only a general right to control. *Pekin Insurance Co. v. Roszak/ADC, LLC*, 402 Ill. App. 3d 1055, 1067 (2010) ("a general contractor that retains the power to coordinate the order in which work is done and to stop work that is performed dangerously" does not retain sufficient control so as to be vicariously liable for the subcontractor's negligence); *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 346 (2008) (" 'the rights retained by [a general contractor] to schedule and stop work [and] to order changes, *** are general rights of supervision and not a retention of control over the incidental aspects of the work' " (quoting *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 206 (2005))); *Bieruta v. Klein Creek Corp.*, 331 Ill. App. 3d 269, 278 (2002) ("even where the employer or general contractor retains the right to inspect the work done, orders changes to the specifications and plans, and ensures that safety precautions are observed and the work is done in a safe manner, no liability will be imposed on the employer or general contractor unless the evidence shows that the employer or general contractor retained control over the 'incidental aspects' of the independent contractor's work"). Accordingly, in light of the development of case law interpreting section 414, we find that the broad language of IPI Civil (2011) No. 55.01 is not an accurate statement of the law.

¶ 171      While plaintiff states, without citation, that "[t]he Illinois Pattern Jury instructions on negligence have been among the most tested and approved instructions in Illinois," our research has only revealed the two cases cited by defendant in which the accuracy of IPI Civil (2011) No. 55.01 has been considered: *Jones v. DHR Cambridge Homes, Inc.*, 381 Ill. App. 3d 18 (2008), and *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13 (2009), which applied the holding in *Jones*. In *Jones*, a different division of the appellate court rejected a general contractor's argument that IPI Civil (2005) 55.01[13] no longer reflected an accurate statement of the law. *Jones*, 381 Ill. App. 3d at 37-38. The general contractor argued that the instruction was no longer an accurate statement of the law in light of *Martens*, where the *Martens* court indicated: " 'The central issue [in a section 414 analysis] is retained control of the

_____

[13]IPI Civil (2005) No. 55.01 and IPI Civil (2011) No. 55.01 are identical.

-32-

independent contractor's work, whether contractual, supervisory, operational, or some mix thereof. The party who retains control is the logical party upon whom to impose the duty to ensure worker safety.' " *Jones*, 381 Ill. App. 3d at 37 (quoting *Martens*, 347 Ill. App. 3d at 318). The *Jones* court disagreed with the general contractor's argument, noting that the *Martens* court referred to IPI Civil (2005) No. 55.02 without criticism, indicating that the *Martens* court did not intend its decision to mean that the pattern instruction no longer reflected an accurate statement of the law. *Jones*, 381 Ill. App. 3d at 38. Additionally, the *Jones* court distinguished *Martens* on its facts, noting that the general contractor in *Jones* could require compliance with its safety standards and stop the work if its safety rules were violated, where the general contractor in *Martens* could not. *Jones*, 381 Ill. App. 3d at 38.

¶ 172     We note that the parties and the court in *Jones* proceeded from an assumption that the pattern instruction was an accurate statement of the law, and only considered whether *Martens* changed the accuracy of the statement. Here, by contrast, defendant does not begin with such an assumption but instead argues that the instruction is inaccurate because it is based on an incorrect interpretation of section 414. Thus, the fact that the *Jones* court did not find that the pattern instruction no longer reflected an accurate statement of the law does not preclude us from finding that IPI Civil (2011) No. 55.01 is not an accurate statement of the law.

¶ 173     However, despite our conclusion that the trial court issued an improper instruction, reversal is not warranted unless the error results in " 'serious prejudice' " to the appellant's right to a fair trial. *Studt*, 2011 IL 108182, ¶ 28 (quoting *Heastie*, 226 Ill. 2d at 543). In the case at bar, we cannot find that the erroneous instruction resulted in serious prejudice to defendant. Although the pattern instruction permits a jury to find control in situations that would not satisfy the requirements of section 414, there is no indication that this was the case here. Instead, the record demonstrates that the crux of plaintiff's theory was that defendant made the decision to stop the use of ATVs, demonstrating control over an operative detail of Sullivan Roofing's work. Thus, throughout trial, the parties focused on the extent of defendant's involvement in the decision to manually move the rolls of rubber membrane. Indeed, during closing argument, plaintiff's counsel noted that "the main issue that you guys will have to decide is who gave that no Honda order as it relates to the big rolls."

¶ 174     As noted in previous sections, there was sufficient evidence for the jury to conclude that defendant was liable under section 414, both vicariously and directly, as a result of testimony concerning defendant's participation in the process that led to manual rolling of the rubber membrane. This is not, as defendant contends, a situation where the only evidence was that defendant ordered plaintiff to stop damaging the roof. Instead, there was testimony that defendant ordered the stoppage of work, participated in implementing a solution to the damage issue, and ordered the use of ATVs to cease  an order that directly impacted the means by which Sullivan Roofing completed its roofing work.

¶ 175     First, there was evidence at trial that defendant noticed the damage to the decking and ordered the work stopped. Zelasco testified that on the first day that roofing materials were loaded onto the roof, he noticed that roofing activity was creasing the decking and notified Pesek and Sullivan; Zelasco also testified that it was a joint decision between defendant and Sullivan Roofing to cease working for a day to assess the damage. Sullivan and Majestic also

-33-

testified that Zelasco placed a call to Sullivan Roofing informing them of damage to the decking, and Pesek testified that he was notified by "[s]omeone from [defendant] FCL" that there was damage to the roof decking and he "took a timeout to craft a solution to this deck damage issue."

¶ 176    Additionally, there was testimony that defendant was involved in seeking a solution to the problem with the decking. For instance, Majestic testified that the decision to use plywood to solve the problem was a collaboration between Sullivan Roofing and defendant, and Sullivan testified that "after a conference between John [Zelasco] and the powers that be at Sullivan, that was a solution that was implemented." Moreover, several of the witnesses testified that defendant gave the order to stop using ATVs to push the rolls of rubber membrane. Sullivan testified that use of ATVs was temporarily stopped: "That was a decision made at the point in time [that] all this happened, to stop everything, and we had to figure out a way that we could use them again and get things rolling and be able to load  so we wouldn't damage the deck." Pesek testified that "it was more likely than not that there was an order to not use the Hondas to push the rolls," and testified that "the order to not use the Hondas either came from Dave Majestic or the [defendant's] superintendent on this job." Plaintiff's brother also testified that the crew was ordered not to use ATVs to push the rolls by someone wearing a white hard hat, and the evidence established that defendant's employees wore hard hats. Finally, plaintiff testified that Zelasco ordered the workers to cease using ATVs to move the rolls of rubber membrane.

¶ 177    Thus, the evidence at trial focused specifically on defendant's involvement in the decision to manually push the rolls of rubber membrane, and the testimony related to that issue was sufficient for a jury to find control. Since, under the facts in the case at bar, the jury considered the same evidence as would have been presented had an accurate instruction been given, we find no prejudice and, consequently, no reversible error. See *Studt*, 2011 IL 108182, ¶¶ 28-29 (despite an inaccurate jury instruction indicating that evidence other than expert testimony would suffice to establish the standard of care in a professional negligence action, finding no serious prejudice because evidence of the standard of care was in fact introduced through expert testimony).

¶ 178    As a final matter, in its petition for rehearing, defendant argues that our decision conflicts with the recent decision of *Powell v. Dean Foods*, 2013 IL App (1st) 082513-B. However, the issues present in the case at bar are not the same as those presented in *Powell*. There, the jury was instructed: " 'If you find that Defendant Jaime Reeves was the agent of the Defendant Dean Foods Company at the time of the occurrence and if you find Jaime Reeves is liable, then all Defendants are liable. If you find that Jaime Reeves is not liable, then no Defendant is liable.' " *Powell*, 2013 IL App (1st) 082513-B, ¶ 133. The court noted that "[t]he instructions, as given to the jury, did not state that it was plaintiffs' burden to prove that Reeves was an agent of Dean Foods" and concluded that "it was reversible error not to give an instruction on the burden of proof on the issue of Dean Foods' agency." *Powell*, 2013 IL App (1st) 082513-B, ¶ 135. Thus, the problem with the jury instruction in *Powell* was that it did not state *who* needed to prove the issue of agency.

¶ 179    In the case at bar, by contrast, the issue does not pertain to who needs to prove that defendant controlled the work of Sullivan Roofing, but instead concerns what evidence is

necessary to demonstrate "control." In other words, the issue is not about *who* needs to prove something, but *how* it needs to be proved, *i.e.*, through evidence demonstrating control over operative details of the work. While we have determined that the pattern instruction is not an accurate statement of the law because it could be read to encompass conduct broader than that contemplated by section 414, in the case at bar, the evidence presented went to the issue of "retained control," as would have been the case had a correct instruction been given. Since the evidence established this element, defendant did not suffer serious prejudice from the incorrect instruction.

¶ 180                                              C. Improper Jury Verdict Form

¶ 181    Defendant next argues that he is entitled to a new trial due to the inclusion of Sullivan Roofing, plaintiff's employer, on verdict form B, which was based on IPI Civil (2011) No. B45.03.A. On that form, the jury found:

> "Assuming that 100% represents the total combined legal responsibility of all persons or entities that proximately caused Teodoro Ramirez's injury, we find the percentage of legal responsibility attributable to each as follows:
>
> a) Teodoro Ramirez 20%
>
> b) FCL Builders, Inc. 40%
>
> c) Sullivan Roofing, Inc. 40%."

Defendant argues that Sullivan Roofing should not have been included on the verdict form. We agree.

¶ 182    "An abuse of discretion standard applies when we review a trial court's decisions relating to verdict forms." *Werner v. Nebal*, 377 Ill. App. 3d 447, 457 (2007) (citing *People v. Roberts*, 351 Ill. App. 3d 684, 690 (2004)); *Gold v. Ziff Communications Co.*, 322 Ill. App. 3d 32, 45 (2001). "The standard for deciding whether a trial court abused its discretion and the propriety of tendered [jury] instructions is 'whether the jury was fairly, fully and comprehensively informed on the relevant principles, considering the instructions in their entirety.' " *Auten v. Franklin*, 404 Ill. App. 3d 1130, 1137 (2010) (quoting *Saunders v. Schultz*, 20 Ill. 2d 301, 314 (1960)).

¶ 183    Analysis of the verdict form requires consideration of section 2-1117 of the Code of Civil Procedure (the Code), which provides:

> "Except as provided in Section 2-1118, in actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant except the plaintiff's employer, shall be severally liable for all other damages. Any defendant whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants except the plaintiff's employer, shall be jointly and severally liable for all other damages." 735

-35-

ILCS 5/2-1117 (West 2008).

Under the express terms of section 2-1117, any fault of Sullivan Roofing, as plaintiff's employer, cannot be included in the apportionment of fault for the purposes of determining defendant's joint and several liability. Consequently, defendant argues that Sullivan Roofing likewise could not have been included on the verdict form.

¶ 184    Based on our research, there have been no cases considering the issue of whether a plaintiff's employer can be included on the verdict form filed after our supreme court issued its decision in *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369 (2008), a decision that we find controls the outcome of the issue. In *Ready*, our supreme court considered whether settling tortfeasors were considered " 'defendants sued by the plaintiff' " within the meaning of section 2-1117. *Ready*, 232 Ill. 2d at 374 n.2 (quoting 735 ILCS 5/2-1117 (West 2004)). There, the plaintiff's husband was killed during a construction project and the plaintiff filed a wrongful-death suit against the building owner, her husband's employer; the general contractor; and a subcontractor on the project. *Ready*, 232 Ill. 2d at 372. The building owner and the general contractor settled prior to trial. *Ready*, 232 Ill. 2d at 372. During trial, the subcontractor was not permitted to present any evidence as to the conduct of the settling defendants and the settling defendants were not listed on the verdict form; the jury found the subcontractor liable for negligence and the trial court found the subcontractor jointly and severally liable for the amount of the verdict remaining after offsets for the husband's comparative negligence and the settlement amounts paid by the settling defendants. *Ready*, 232 Ill. 2d at 373.

¶ 185    On appeal, the subcontractor argued that the trial court erred by failing to include the settling defendants on the verdict form, claiming that if the jury had been able to consider their share of fault, the subcontractor's share may have been less than 25%, making the subcontractor only severally liable. *Ready*, 232 Ill. 2d at 373. The appellate court agreed, concluding that, under section 2-1117, a nonsettling defendant's fault should be assessed relative to the fault of all defendants, including settling defendants, and, thus, the settling defendants should have been included on the verdict form for purposes of fault apportionment. *Ready*, 232 Ill. 2d at 373-74.

¶ 186    The supreme court, however, after considering the language and history of the statute, found that nonsettling defendants are not " 'defendants sued by the plaintiff' " within the meaning of section 2-1117, stating that "we disagree with the appellate court's holding that, under section 2-1117, a remaining defendant's culpability must be assessed relative to the culpability of all defendants, including settling defendants." *Ready*, 232 Ill. 2d at 383. Accordingly, the supreme court held that "section 2-1117 does not apply to good-faith settling tortfeasors who have been dismissed from the lawsuit" and reversed the portion of the appellate court's judgment that reversed the trial court as to liability. *Ready*, 232 Ill. 2d at 385.

¶ 187    After the supreme court's 2008 decision in *Ready*, appellate courts and parties have uniformly interpreted *Ready* as preventing settling defendants from appearing on a verdict form. See *Miranda v. Walsh Group, Ltd.*, 2013 IL App (1st) 122674, ¶ 14 (noting that, in *Ready*, "our supreme court held that a settling defendant was not a 'defendant sued by the

plaintiff' under section 2-1117 of the Code and should not be named on the jury verdict form for the appropriation of fault"); *Cellini v. Village of Gurnee*, 403 Ill. App. 3d 26, 37 (2010) (during a hearing on a motion for a good-faith finding between settling parties, a nonsettling defendant argued "that in light of our supreme court's decision in *Ready v. United/Goedecke Services, Inc.*, which held that a settling tortfeasor was not a 'defendant' considered in apportioning fault and would not be listed on the verdict form, a nonsettling defendant *** would be 'left holding the bag' "); *Jablonski v. Ford Motor Co.*, 398 Ill. App. 3d 222, 271 (2010) (finding that the trial court did not abuse its discretion in refusing a defendant's proposed verdict forms, which would have required the jury to allocate fault between the defendant and a settling tortfeasor, due to the supreme court's decision in *Ready*).

¶ 188    Indeed, at least one court has found reversible error where a settling tortfeasor was improperly listed on the jury verdict form. In *Heupel v. Jenkins*, 395 Ill. App. 3d 689, 690 (2009), the plaintiff was injured when the defendant's vehicle collided with another vehicle, driven by Murugeson. Prior to filing suit, the plaintiff settled with Murugeson and, after a jury trial, the jury returned a verdict in favor of the defendant. *Heupel*, 395 Ill. App. 3d at 690. On appeal, the plaintiff argued, *inter alia*, that the trial court erred by including Murugeson on one of the jury verdict forms and the appellate court affirmed. *Heupel*, 395 Ill. App. 3d at 690.

¶ 189    In determining that inclusion of Murugeson on the jury verdict form was proper, the court in the original opinion filed in 2008 addressed policy reasons:

"Presumably in the case at bar, plaintiff settled with the 'indigent' tortfeasor with the intent of insulating Murugeson from the issue of fault and proceeded against defendant, the 'wealthy' tortfeasor, who the jury ultimately concluded was not liable. Moreover, unlike the driving concern in *Blake* [*v. Hy Ho Restaurant, Inc.*, 273 Ill. App. 3d 372, 374 (1995)], namely, that allowing the jury to consider settled tortfeasors in the fault allocation would expose them to the expense of discovery and 'frustrate Illinois public policy favoring peaceful and voluntary resolutions of claims through settlement agreements' [citation], plaintiff in the instant case essentially brought Murugeson into the case as a party when she called Murugeson as a witness to disprove defendant's 'empty chair defense.' Plaintiff's attempt to use Murugeson and the prior settlement as both a sword and a shield completely contradicts the spirit and purpose of section 2-1117 of the Code. Consequently, we conclude that naming Murugeson on the jury verdict form was proper." *Heupel v. Jenkins*, 379 Ill. App. 3d 893, 904 (2008) (opinion prior to remand).

¶ 190    After the supreme court decided *Ready*, it vacated the judgment in *Heupel* and directed the *Heupel* court to reconsider its decision in light of *Ready*. On reconsideration, the *Heupel* court reversed and remanded the case for a new trial. *Heupel*, 395 Ill. App. 3d at 690. The *Heupel* court determined that, based on *Ready*, Murugeson was not a "defendant sued by the plaintiff" within the meaning of section 2-1117 and, consequently, should not have been listed on the jury verdict form. *Heupel*, 395 Ill. App. 3d at 693. Furthermore, the court determined that the inclusion of Murugeson's name on the verdict form constituted reversible error warranting a new trial because "here, the jury heard a great deal of testimony regarding Murugeson's role in the collision" and "we cannot be certain that the jury did not consider

-37-

the amount of fault attributable to Murugeson." *Heupel*, 395 Ill. App. 3d at 693.

¶ 191　　　In the case at bar, we are not asked to consider the presence of a settling tortfeasor on a jury verdict form. Instead, we are asked to consider the presence of plaintiff's employer, Sullivan Roofing, on the form. However, we find that the same result must follow.

¶ 192　　　As defendant notes, there is no doubt that Sullivan Roofing is specifically excluded from an apportionment of fault under section 2-1117 of the Code. Thus, the sole question is whether that exclusion also means that Sullivan Roofing should have been excluded from the jury verdict form. The trial court and plaintiff rely on the comments to the IPI jury verdict form to support Sullivan Roofing's presence on the verdict form. The comments attempted to reconcile *Ready* with older cases finding that the fault of nonparty tortfeasors could be considered. Quoting *Bofman v. Material Service Corp.*, 125 Ill. App. 3d 1053 (1984), and *Smith v. Central Illinois Public Service Co.*, 176 Ill. App. 3d 482 (1988),[14] the comments note:

> " [']Consideration of the negligence of both parties and non-parties to an action is essential for determining liability commensurate with degree of total fault.' [Citation.] [']In cases where contributory negligence is involved, it is permissible to introduce evidence of the liability of a non-party. The liability of non-party tortfeasors may be considered in order to determine the extent of plaintiff's responsibility for his injuries.' [Citation.]" IPI Civil (2011) No. B45.03.A, Comment, at 229.

The comments then continue:

> "In *Bofman*, a plaintiff was able to obtain reversal of a verdict because the jury was not properly instructed to account for the negligence of a settled nonparty. While *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369 (2008) held that the percentage fault of a defendant who settled is not part of the calculation under 735 ILCS 5/2-1117, that case did not reduce the vitality of *Bofman* or *Smith*. If the jury hears evidence to suggest fault on the part of settled parties and if contributory negligence is claimed, the settled parties should be listed on the verdict form to correctly determine the percentage contributory fault of the plaintiff. The fault of the settling parties, however, should be disregarded for purposes of the 2-1117 calculation." IPI Civil (2011) No. B45.03.A, Comment, at 230.

However, application of the rule proposed by the comments demonstrates that these comments are inconsistent with the holding in *Ready*.

¶ 193　　　In *Ready*, as noted, the supreme court reversed the appellate court's determination that settling tortfeasors should be listed on the jury verdict form, finding that "section 2-1117 does not apply to good-faith settling tortfeasors who have been dismissed from the lawsuit." *Ready*, 232 Ill. 2d at 385. *Ready* came before the supreme court again after its remand to the appellate court, and the supreme court then determined that the trial court erred in excluding evidence of the settling parties' culpability, finding that it would have supported the

---

[14]We note that neither *Bofman* nor *Smith* has been cited for this proposition since *Ready* was decided.

defendant's sole-proximate-cause defense. *Ready v. United/Goedecke Services, Inc.*, 238 Ill. 2d 582, 591-92 (2010). Thus, despite the settling defendants' absence from the verdict form, evidence of their culpability should have been presented to the jury. According to the IPI comments, then, since (1) the jury should have heard evidence to suggest fault on the part of settled parties and (2) the jury found the plaintiff's comparative negligence to be 35% (*Ready*, 232 Ill. 2d at 373), meaning that contributory negligence was claimed, it would follow that "the settled parties should be listed on the verdict form to correctly determine the percentage contributory fault of the plaintiff" (IPI Civil (2011) No. B45.03.A, Comment, at 230). However, the supreme court held that the settled parties should *not* be listed on the verdict form, without any reference to the impact of the settled parties' absence on the plaintiff's percentage of fault. Indeed, none of the cases citing *Ready* and concluding that settled tortfeasors should not appear on the verdict form contain any discussion of the determination of the plaintiff's level of fault. Instead, the conclusion to be drawn is that the section 2-1117 analysis determines whether the nonparty may appear on the verdict form. See also *Jones*, 381 Ill. App. 3d at 31-32 (determining that, based on section 2-1117, "in order for [a nonparty] to be included on the verdict form, it must have been named as a party" by the defendant). Here, since section 2-1117 expressly excludes Sullivan Roofing as plaintiff's employer, Sullivan Roofing should not have been named on the verdict form.

¶ 194    We do not find plaintiff's argument that "defendant cannot have it both ways, legally or equitably," to be persuasive. As noted, the *Heupel* court identified policy reasons for including Murugeson on the verdict form. *Heupel*, 379 Ill. App. 3d at 904 (opinion prior to remand). Despite those reasons, in light of *Ready*, the court was compelled to find that Murugeson should not have been listed on the jury verdict form. *Heupel*, 395 Ill. App. 3d at 693. Likewise, in the case at bar, although plaintiff poses reasonable arguments for including Sullivan Roofing on the verdict form, our supreme court's decision in *Ready* is equally applicable here, where section 2-1117 expressly excludes that entity from apportionment of fault.

¶ 195    However, despite our conclusion that Sullivan Roofing should not have been listed on the verdict form, reversal on the basis of faulty jury instructions is not warranted unless the error results in " 'serious prejudice' " to the appellant's right to a fair trial. *Studt*, 2011 IL 108182, ¶ 28 (quoting *Heastie*, 226 Ill. 2d at 543); *Schultz*, 201 Ill. 2d at 274 ("A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant."). In the case at bar, defendant's brief does not specify any prejudice it suffered from the improper verdict form, and it is difficult to determine where any prejudice would arise. This is not a situation where a party was excluded from a verdict form erroneously, such that a proper jury form would likely lessen the defendant's percentage of fault. Instead, here, fault was apportioned among *more* parties, presumably resulting in defendant bearing a smaller share of fault than would otherwise be the case.

¶ 196    During oral argument, defendant's counsel stated that defendant was prejudiced because the 40% fault allocated to Sullivan Roofing would have instead been allocated to plaintiff had Sullivan Roofing been excluded from the verdict form. We do not find this argument persuasive. The evidence at trial established that either Sullivan Roofing (under defendant's

view) or defendant (under plaintiff's view) ordered the workers to stop using ATVs and push the membrane rolls manually; there is absolutely no evidence that plaintiff made the choice to manually roll the membrane independently. Any share of the fault apportioned to plaintiff involved the question of whether more people should have assisted in moving the roll. Thus, we find no merit in defendant's contention that Sullivan Roofing was factually more aligned with plaintiff than with defendant. Normally, the more parties listed on a jury verdict form will help a defendant more than a plaintiff. Since we cannot find that defendant was seriously prejudiced by the erroneous verdict form, we find no reversible error.

¶ 197                          D. Admission of Evidence

¶ 198     Next, defendant claims that the trial court erred in refusing to permit the Sullivan Roofing incident report into evidence and in permitting the contract between defendant and the property owner to be admitted into evidence. The decision to admit or exclude evidence rests within the sound discretion of the trial court and that decision will not be disturbed absent an abuse of discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). A trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46 (2005). Moreover, a party is not entitled to reversal based upon the trial court's evidentiary rulings unless the error substantially prejudiced the aggrieved party and affected the outcome of the case. *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 462 (2009). The party seeking reversal bears the burden of establishing such prejudice. *Bosco*, 388 Ill. App. 3d at 462.

¶ 199                      1. Sullivan Roofing Incident Report

¶ 200     First, defendant argues that the trial court erred in refusing to permit the Sullivan Roofing incident report into evidence. During Sullivan's testimony, defense counsel attempted to introduce an incident report completed by Sullivan into evidence. Sullivan testified that plaintiff reported his back injury to Sullivan, who filled out an incident report in his capacity as safety director; Sullivan testified that keeping such reports was part of Sullivan Roofing's normal course of business. Sullivan further testified that the report was in his handwriting and bore his signature. Defense counsel then sought to admit the report into evidence, and plaintiff's counsel objected. After examining the document and further questioning of Sullivan outside the presence of the jury, the court sustained the objection: "The objection as to the record itself is sustained. Whatever you choose to have him testify to as to his memory is still of evidentiary value. But because of the lack of reliability on the dates based on the voir dire and the *** deposition, I'm going to sustain the objection. I don't *** find it to be within the business records exception because of lack of reliability. The rest of the testimony is up to you." The court further noted: "It has to be created in an ordinary course of business and if it's on or about the time. That's why they're reliable. And what we have is that missing element. It wasn't created on or about the time because he says the date may be wrong and I don't remember."

¶ 201     On appeal, defendant argues that the trial court erred in concluding that the incident report did not qualify as a business record and was, therefore, inadmissible hearsay.

-40-

Admission of business records into evidence is governed by Supreme Court Rule 236, which provides:

> "Any writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility. The term 'business,' as used in this rule, includes business, profession, occupation, and calling of every kind." Ill. S. Ct. R. 236(a) (eff. Aug. 1, 1992).

Thus, if it was the regular course of the business to make such a memorandum at the time of such an act, "Rule 236 requires only that the party tendering the record satisfy the foundation requirement of demonstrating that the record was made in the regular course of business and at or near the time of the transaction." *In re Estate of Weiland*, 338 Ill. App. 3d 585, 600 (2003) (citing *Progressive Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 305 (1992)); *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 414 (2005).

¶ 202    In the case at bar, the trial court found that the incident report did not qualify as a business record because Sullivan's testimony was insufficient to demonstrate that the incident report was made at or near the time of plaintiff's injury. We cannot find that the trial court abused its discretion in making that determination. Sullivan testified, and the incident report stated, that plaintiff's injury was reported to Sullivan on October 11; however, Sullivan admitted that the payroll records indicated that plaintiff's last day on the payroll was October 7. More importantly, however, Sullivan further admitted that it was possible that he was standing on a different roof, and not the Wilton roof, when plaintiff informed him of the incident and that "my dates could be wrong on the document. And I don't know. I can't verify that. But I remember specifically standing there talking to him." Given this uncertainty by the report's preparer over the date the report was completed, we cannot find that the trial court abused its discretion in determining that defendant had not satisfied the foundational requirements for admission of the incident report as a business record.

¶ 203    Defendant argues that courts have repeatedly ruled that " 'a reasonable time thereafter' can encompass a period of time far, far longer than the few days at issue in the case at bar." For support, defendant cites *Taluzek v. Illinois Central Gulf R.R. Co.*, 255 Ill. App. 3d 72, 85 (1993), in which a document prepared approximately two weeks after an injury was considered reasonable, and *Amos v. Norfolk & Western Ry. Co.*, 191 Ill. App. 3d 637, 646 (1989), in which a one-month delay was reasonable. However, the trial court's decision was not based on the fact that the incident was reported on October 11 when the injury occurred on October 6. Instead, the trial court's concern was that "[i]t wasn't created on or about the time because he says the date may be wrong and I don't remember." In other words, the date reported was not the issue; the issue was that the preparer of the report did not know exactly when the document was prepared. We cannot find that excluding the document on this basis

was error.

¶ 204    Defendant also argues that the incident report should have been admitted because it was the admission of a party opponent and, thus, not hearsay at all. "Any oral or written out-of-court statement by a party to the action, or attributable to a party, which tends to establish or disprove any material fact in a case is an admission and is competent evidence against that party in the action." *Ficken v. Alton & Southern Ry. Co.*, 291 Ill. App. 3d 635, 647 (1996) (citing *Werner v. Botti, Marinaccio & DeSalvo*, 205 Ill. App. 3d 673, 679 (1990)); *CFC Investment, L.L.C. v. McLean*, 387 Ill. App. 3d 520, 529 (2008). "The admissibility of such statements of fact rests on the presumption that courts can usually rely on statements made against the speaker's interests." *CFC Investment*, 387 Ill. App. 3d at 529 (citing *Felker v. Bartelme*, 124 Ill. App. 2d 43, 50 (1970)). However, in the case at bar, the trial court expressly found that the incident report was not reliable based on the discrepancy over when it was completed. Thus, we cannot find that it should have been admitted as an admission of a party opponent. See *Zaragoza v. Ebenroth*, 331 Ill. App. 3d 139, 141-42 (2002) (in order for a codefendant's testimony of a conversation between the codefendant and the defendant to be admissible as a party admission, the defendant "must have been a party opponent, he must have made an admission, and the [codefendant's] testimony must have been reliable"). The same reasoning applies to defendant's claim that, since it would not have been offered to prove the truth of the matter asserted, it was not hearsay at all.

¶ 205    Moreover, even if the report should have been admitted, its exclusion does not constitute reversible error because the same information was presented to the jury through Sullivan's testimony. Sullivan testified that, at one point during the two weeks of the Wilton project, plaintiff approached him on the roof of the Wilton project and informed him and Pesek that he had been pushing a bundle of insulation alone "and felt a twinge in his back." Sullivan further testified that, based on the time sheets, plaintiff was working on a different project on Monday, September 27. He was working on the Wilton project on September 28 and 29, and was working on a third project on September 30 and did not work on Friday, October 1. Thus, the jury heard that plaintiff had initially given a different account of the injury and that plaintiff was working on other Sullivan Roofing projects during the same time frame. Accordingly, we affirm the trial court's decision not to admit the incident report into evidence.

¶ 206                               2. General Contract

¶ 207    Defendant also argues that the trial court erred in admitting the contract between defendant and the property owner into evidence because it was not relevant. Defendant emphasizes that the issue central to the case is the determination of who had control as between Sullivan Roofing, the subcontractor, and defendant, the general contractor  not the question of who had control as between the general contractor and the property owner, which was the only purpose of the contract between defendant and the property owner.

¶ 208    "The rule is stark and absolute: 'Irrelevant evidence is not admissible.' " *Downey v. Dunnington*, 384 Ill. App. 3d 350, 387 (2008) (quoting *Maffett v. Bliss*, 329 Ill. App. 3d 562, 574 (2002)). " '[E]vidence is relevant if it has any tendency to make the existence of a fact

that is of consequence to the determination of the action either more or less probable [than] it would be without the evidence.' " *In re Estate of Bitoy*, 395 Ill. App. 3d 262, 277 (2009) (quoting *Downey*, 384 Ill. App. 3d at 387). In the case at bar, we cannot find that the contract was irrelevant and, therefore, inadmissible.

¶ 209     The contract between defendant and the property owner indicated that, as between defendant and the property owner, defendant was "solely responsible for the construction, means, methods, techniques, sequences and procedures and to coordinate all portions of the work," as Puchalski testified. Additionally, under the contract, defendant undertook the responsibility of safety for the work site. Finally, although not mentioned by either party, the contract included a provision in which defendant could require each subcontractor "to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumed toward the Owner and Architect." Thus, the contact was relevant in assisting the jury to determine the issue of control.

¶ 210     Defendant argues that we have repeatedly held that a contract between a general contractor and a property owner "simply has no bearing on the Section 414 analysis." However, defendant's cited cases do not support that argument. While the contract between the general contractor and the property owner certainly is substantially less relevant for the section 414 analysis than the contract between the general contractor and the subcontractor, none of defendant's cited cases has determined that the contract should not be admissible at all because it is irrelevant; indeed, all of the cases involve motions for summary judgment and do not consider evidentiary issues. Accordingly, we cannot find that the trial court abused its discretion in finding the contract admissible.

¶ 211     Defendant further argues that, even if the contract was relevant, plaintiff failed to lay a proper foundation for its admission and the trial court "grossly overstepped its bounds in assisting Plaintiff by forcing Defendant FCL in mid-trial to produce a foundation witness for Plaintiff." We find defendant's argument unpersuasive.

¶ 212     After the trial court found that Zelasco had not laid a proper foundation for the admission of the contact, plaintiff's counsel indicated that they had relied on defendant's disclosure that Zelasco would lay a foundation for the contract, so they were "kind of in a bind here," since he was unable to do so. Plaintiff's counsel requested that, "if the Court feels the foundation, as it relates to the contract specifically, is inadequate, then I  given the [Rule] 213 disclosure of defense, relative to Mr. Zelasco, I think I'm entitled to call a record keeper, a signatory or somebody from FCL that can lay the foundation, notwithstanding the fact it's the day before I rest my case." Over defendant's objection, the court agreed and told defendant, "you're on notice that I would grant plaintiff's motion. And that the request will come to you, I'm assuming, within the next 12 hours. And that before this case is put to rest, I expect to see some discussion and/or resolution one way or another." The next day, plaintiff called Christopher Linn, vice president of defendant, who provided the necessary foundation and the contract was admitted into evidence.

¶ 213     An examination of the record reveals that plaintiff relied on Zelasco, defendant's employee, to provide a foundation for the contract, as disclosed in defendant's discovery

responses. When Zelasco was unable to do so, the trial court ordered defendant to provide another employee that could provide the sufficient foundation. Defendant argues that its discovery disclosures said only that Zelasco would testify as to the subcontracts on the Wilton project. However, these disclosures are not included in the record on appeal, so we cannot make any comment as to their contents. Accordingly, we cannot find any error in the trial court's conduct and affirm its decision as to the admission of the contact between defendant and the property owner.

¶ 214                                    E. Discovery Violations

¶ 215      Defendant also argues that the trial court erred in permitting the testimony of Jaime Rojas and David Gibson to be presented due to the improper disclosure of these witnesses under Rule 213. "The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of that discretion." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). As noted, a trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court" (internal quotation marks omitted) (*Foley*, 361 Ill. App. 3d at 46) and a party is not entitled to reversal based upon the trial court's evidentiary rulings unless the error substantially prejudiced the aggrieved party and affected the outcome of the case. *Bosco*, 388 Ill. App. 3d at 462.

¶ 216      The Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties. *Sullivan v. Edward Hospital*, 209 Ill. 2d at 109; *Warrender v. Millsop*, 304 Ill. App. 3d 260, 265 (1999). In *Sullivan*, the Illinois Supreme Court stated that its rules were its best efforts to manage the complex and important process of discovery. *Sullivan*, 209 Ill. 2d at 109. "To allow either side to ignore Rule 213's plain language defeats its purpose and encourages tactical gamesmanship." *Sullivan*, 209 Ill. 2d at 109-10 (citing *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 537 (1998)). In the case at bar, even if disclosure of plaintiff's witnesses violated Rule 213, we cannot find that the trial court abused its discretion in permitting the witnesses to testify.

¶ 217      Our Illinois Supreme Court has set forth six factors that must be considered in determining whether the exclusion of testimony is an appropriate sanction for nondisclosure: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness. *Sullivan*, 209 Ill. 2d at 110.

¶ 218                                       1. Jaime Rojas

¶ 219      With regard to Jaime Rojas, plaintiff purportedly disclosed Rojas as a Rule 213(f)(2) witness in a January 4, 2012, letter to defense counsel; however, defense counsel claimed not to have received the letter and only learned of Rojas when plaintiff's counsel faxed a notice of evidence deposition. We have no way of knowing whether the letter was sent or received; however, the trial court heard defendant's argument that counsel never received the letter and nevertheless permitted the evidence deposition to take place and permitted the evidence

-44-

deposition to be presented to the jury.[15]

¶ 220    Considering the factors set forth in *Sullivan*, we cannot find that the trial court abused its discretion in refusing to bar Rojas' testimony. Rojas testified that he performed a functional capacity assessment of plaintiff and opined that plaintiff could only work at a light physical demand level. If defendant did not know of Rojas' existence until two days before his deposition, it was certainly surprised and timely objected, and there is no issue of defendant's diligence in other discovery matters. However, as noted, it is unclear whether defendant had prior notice of Rojas' status as a Rule 213(f)(2) witness. Additionally, the nature of his testimony and its prejudicial effect are small; plaintiff had several witnesses testify as to plaintiff's limitations, and Rojas' testimony concerned a single evaluation and an opinion limited to plaintiff's condition on that day. Finally, there is no indication that plaintiff was not acting in good faith: plaintiff had retained new counsel in October 2011, and counsel explained the reasons for the evidence deposition to the trial court, stating that it had only been recently discovered that Rojas was now living in Colorado and he would only be available for a few days.

¶ 221    We find defendant's citation of *Nedzvekas v. Fung*, 374 Ill. App. 3d 618 (2007), and *Boyd v. City of Chicago*, 378 Ill. App. 3d 57 (2007), to be unpersuasive. In both cases, the reviewing court was determining whether the trial court had abused its discretion in barring witnesses due to Rule 213 violations and determined that it had not. However, in the case at bar, we are considering whether the trial court abused its discretion in *not* barring Rojas. Consequently, defendant's cases are of limited use and we cannot find that the trial court abused its discretion in permitting Rojas to testify.

¶ 222                                    2. David Gibson

¶ 223    Defendant's only arguments concerning Gibson involve prejudice. While defendant acknowledges that Gibson was disclosed with sufficient time to be deposed, defendant also argues that Gibson's testimony was much more prejudicial, since Gibson attached a dollar figure to plaintiff's losses. However, considering the other factors, we cannot find that the trial court abused its discretion in permitting Gibson to testify. There was no indication that plaintiff acted in bad faith, and defendant's surprise was limited, as plaintiff's new counsel immediately made an oral motion to disclose a damages witness upon taking over the case. Additionally, defendant had sufficient time to retain its own damages expert, as defendant stated during the hearing on the motion *in limine* to bar Gibson, so defendant could have mitigated the damaging nature of Gibson's testimony.[16] Accordingly, we cannot find that the trial court abused its discretion in permitting Gibson to testify.

---

[15]We note that different judges decided the motion to quash the evidence deposition and the motion *in limine* seeking to bar Rojas' testimony.

[16]Gibson was the only damages witness to testify at trial.

¶ 224                                F. Cumulative Error

¶ 225        Finally, defendant argues that the cumulative errors during the trial require a new trial.
"A new trial is necessary when the cumulative effect of trial errors so deprives a party of a
fair trial that the verdict might have been affected." *Netto v. Goldenberg*, 266 Ill. App. 3d
174, 184 (1994). However, in the case at bar, we cannot find that defendant was deprived of
a fair trial such that the verdict might have been affected.

¶ 226                                   CONCLUSION

¶ 227        The trial court did not err in denying defendant's motion for judgment notwithstanding
the verdict, nor did it err in denying defendant's motion for a new trial.

¶ 228        Affirmed.